[No. D008755. Fourth Dist., Div. One. June 27, 1990.]

MARYLAND CASUALTY COMPANY, Plaintiff and Respondent, v. GEORGE WAYNE REEDER et al., Defendants and Appellants.

## COUNSEL

Kenneth W. Kind, Joel M. Pressman, Brian P. Ballo, Kimberly Lewis, Kolodny & Pressman, Neil, Dymott, Perkins, Brown & Frank, James A. McFall, Robert D. Shoecraft, Joseph D. Oliva, Duckor & Spradling, Alan R. Johnston, Ann M. McMenomy and Duke, Gerstel, Shearer & Bregante for Defendants and Appellants.

William R. Friedrich, Craig S. Meredith, Farella, Braun & Martel, James K. Eckmann, Evan C. McKenzie and Aguirre & Eckmann as Amici Curiae on behalf of Defendants and Appellants.

Robert P. Coffin, David H. Kidd and Ault, Deuprey, Jones, Danielsen & Gorman for Plaintiff and Respondent.

Susan M. Goldbeck as Amicus Curiae on behalf of Plaintiff and Respondent.

## OPINION

**BENKE, Acting P. J.**—The purchasers of condominium units, their home-owners association, an individual developer and the entities which participated in the construction and sale of the condominium project appeal from a summary judgment entered in favor of a liability insurer. We reverse because we find the exclusions the insurance company relies upon do not apply as a matter of law to the claims made against the insureds.

### FACTUAL AND PROCEDURAL SUMMARY

Although the record in this case is voluminous, it does not definitively describe the relationship between the various entities who developed the condominium project. Generally the parties agree defendant Samuel Pearlman purchased three adjoining parcels of vacant land in Carlsbad in 1972. At the time Pearlman bought the parcels they had been graded. Thereafter Pearlman formed defendant Roundtree, Ltd., a partnership. The partnership in turn formed a joint venture with defendant Twelve Trees Corporation (Twelve Trees). The joint venture was named Roundtree Condominiums, also a defendant. Defendant DMF Construction, Inc. (DMF), was retained as a general contractor to construct condominiums on the three parcels. At various stages between 1980 and 1985, Pearlman, Roundtree, Ltd., Twelve Trees, Roundtree Condominiums and DMF were each named insureds on a series of comprehensive general liability policies issued by plaintiff Maryland Casualty Company (Maryland). Significantly some of the policies included a broad form property damage endorsement.

After the condominiums were completed, they were conveyed to various individuals. Between 1984 and 1987 separate purchasers of the condominiums and the homeowners association filed three complaints against Pearlman, Roundtree, Ltd., Roundtree Condominiums, Twelve Trees and DMF. The complaints alleged the plaintiffs' condominium units had been damaged by soil subsidence. The plaintiffs in the first complaint (case No. N26398) alleged their condominium was "suffering from severe cracks in the walls and settling of the slab." The plaintiffs in the second complaint (case No. N34499) alleged their units "have been damaged to the extent

that they are rendered valueless." In the third complaint (case No. N38256) the homeowners association alleged the soil subsidence had caused "cracking and separation in the concrete floor slabs, foundations, retaining walls, interior and exterior walls and ceilings, and exterior concrete patio areas and walkways at affected Condominium Units and Common Areas within the Project." The homeowners association also alleged the roofing system had failed "causing rain water and moisture to penetrate the roofs, causing damage to the building structures and the contents of the affected Condominium Unit living spaces."

On June 23, 1987, Maryland filed three complaints for declaratory relief (case Nos. N38217, N38247, N38256). Maryland's complaints asked for declaratory relief against the plaintiffs in case Nos. N26398, N34499, N38256 and each of Maryland's insureds named as defendants in those cases. Maryland alleged it had no duty to either indemnify the plaintiffs in the underlying cases or defend its insureds.

The declaratory relief actions were consolidated and Maryland moved for summary judgment on the grounds the policies it issued relieved it from liability for the claims made against the contractor and the condominium developers. In the trial court Maryland argued the damage suffered by the plaintiffs in the underlying cases was not "property damage" within the meaning of its policies. Maryland further argued that even if property damage were involved, coverage was barred by the terms of four exclusions in its policies. Those exclusions eliminate coverage for property damage arising out of work performed by an insured, the products of an insured, premises alienated by an insured and participation in a joint venture which was not itself named as an insured under the policy.

The insureds also moved for summary judgment. The insureds argued the broad form endorsement covered the claims made against them as a matter of law.

Relying on what it viewed as the persuasive reasoning set forth in *Knutson Const.* v. *St. Paul Fire & Marine Ins.* (Minn. 1986) 396 N.W.2d 229 (*Knutson*), the trial court found the work performed exclusion applicable and granted Maryland's motion. Following entry of judgment in Maryland's favor, the named insureds, the individual condominium owners and the homeowners association filed timely notices of appeal.

ISSUES ON APPEAL

Because we must affirm the trial court's ruling if there is any basis in the record for doing so (see *Snider* v. *Snider* (1962) 200 Cal.App.2d 741, 756

[19 Cal.Rptr. 709]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 261, pp. 267-269), on appeal we must determine whether any of the grounds Maryland has urged either here or in the trial court entitled it to a summary judgment. We find no such grounds. The face of the underlying complaints discloses property damage within the meaning of Maryland's policy. Moreover the record here does not support application of any of the exclusions Maryland has asserted: the insurance industry's own interpretation of the broad form endorsement prevents application of the "work performed" exclusion in this case; similar industry interpretation of the "products" exclusion prevents its application as a matter of law; even under a broad interpretation the premises alienated exclusion only applies to one of the insureds, and, in light of later changes in the exclusion we are unwilling to accept such a broad interpretation; finally, the joint venture exclusion is unavailing because the Roundtree Condominiums joint venture may in fact have been a named insured under policies which include the broad form endorsement.

DISCUSSION

I

*Comprehensive Liability Policies*

■ Generally liability policies, such as the ones in dispute here, are not designed to provide contractors and developers with coverage against claims their work is inferior or defective. (See *Rafeiro v. American Employers' Ins. Co.* (1970) 5 Cal.App.3d 799, 808-809 [85 Cal.Rptr. 701].) The risk of replacing and repairing defective materials or poor workmanship has generally been considered a commercial risk which is not passed on to the liability insurer. (See *Volf v. Ocean Accident & Guar. Corp.* (1958) 50 Cal.2d 373, 376 [325 P.2d 987] (*Volf*); *Western Employers Ins. Co. v. Arciero & Sons, Inc.* (1983) 146 Cal.App.3d 1027, 1031-1032 [194 Cal.Rptr. 688]; Macaulay, *Justice Traynor and the Law of Contracts* (1961) 13 Stan.L.Rev. 812, 825-826.) Rather liability coverage comes into play when the insured's defective materials or work cause injury to property other than the insured's own work or products. As one commentator explained: "This distinction is significant. Replacement and repair costs are to some degree within the control of the insured. They can be minimized by careful purchasing, inspection of material, quality control and hiring policies. If replacement and repair costs were covered, the incentive to exercise care or to make repairs at the least possible cost would be lessened since the insurance company would be footing the bill for all scrap. Replacement and repair losses tend to be more frequent than losses through injury to other property, but replacement and repair losses are limited in amount since the greatest loss cannot exceed the cost of total replacement. If the insured will stand these losses,

insurance can be provided more cheaply since the company will be freed from administering many small claims for repairs, and it can set a rate for the more unusual risk of injury to property other than the contractor's work or product. This risk can be the hazardous one since there are no natural limitations on the damage the contractor might do to a homeowner's or a neighbor's property." (Macaulay, *supra*, 13 Stan.L.Rev. at pp. 825-826.)

In actually articulating the risks which will be covered by a liability policy common practice is "to cover a broad risk at the beginning of the policy but to shift certain risks back to the insurance buyer by means of exclusions stated later." (Macaulay, *supra*, 13 Stan.L.Rev. at p. 822.) Such is the case here. At the outset Maryland's liability policy provides broad definitions of property damage and personal injury and states in its insuring clause the company will pay sums the insured becomes liable for as a result of property damage or personal injury. The insuring clause is then followed by no less than 17 exclusions which detail the myriad of circumstances in which Maryland will not cover personal injury or property damage claims.

Here, in addition to a basic policy with a broad coverage provision followed by exclusions designed to shift certain risks back to the insured, we have an additional risk-altering mechanism. By paying an additional 20 percent of their basic premium some of the insureds in this case purchased an endorsement which narrowed the exclusions set forth in the basic policy. Thus the endorsement returned to Maryland some of the risks it had shifted by way of the exclusions.

We also note that in drafting its policy and endorsement Maryland utilized standard form provisions prepared by the Insurance Services Organization (ISO). In addition to drafting standard form provisions, the ISO publishes circulars which describe the intent and effect of its standard provisions. As we shall explain in greater detail below, the ISO's standard provisions are also the subject of interpretation and comment by other insurance industry organizations and publications. The presence of the standard provisions in the Maryland policy and the concomitant availability of interpretative literature is of considerable assistance in determining precisely what risks the Maryland policies cover.

With this background in mind we turn to the disputed provisions of the Maryland policies.

## II

### *Property Damage*

Under each of the policies Maryland issued, "property damage" is defined as "(1) physical injury to or destruction of tangible property which

occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an **occurrence** during the policy period." "Occurrence" is defined as "an accident, including continuous or repeated exposure to conditions, which results in **bodily injury** or **property damage** neither expected nor intended from the standpoint of the **insured**." █ Maryland contends the damage the homeowners and their association have alleged is not property damage within the meaning of these provisions.

Similar language was subject to interpretation by the court in *St. Paul Fire & Marine Ins. Co.* v. *Coss* (1978) 80 Cal.App.3d 888, 892 [145 Cal.Rptr. 836] (*Coss*). In *Coss* the plaintiff homeowners sued a contractor because they believed he used defective products and workmanship in constructing their home. The homeowners sought the costs they incurred in engaging architects and contractors to correct the defective work of the contractor, for loss of use of the house, for the cost of renting a substitute residence and for attorney fees incurred in prosecuting their action against Coss. In holding these losses were not property damage within the meaning of the policy, the court relied upon *Hamilton Die Cast, Inc.* v. *United States F. & G. Co.* (7th Cir. 1975) 508 F.2d 417, 419-420 (*Hamilton Die Cast*), where a manufacturer of tennis rackets tried to recover the cost of replacing defective frames from its insurer. In rejecting that claim the *Hamilton Die Cast* court said: "We do not think that the mere inclusion of a defective component, where no physical harm to the other parts results therefrom, constitutes 'property damage' within the meaning of the policy. For example, if an automobile crash results from the failure of its defective tire, the defective component can be said to have caused 'property damage' to the finished product. If, however, some of the tires purchased by the automobile manufacturer are found to be defective and the manufacturer therefore withdraws its cars from the market, there has not been 'injury to or destruction of tangible property' [within the coverage provisions]." (*Id.*, at pp. 419-420.)

In applying the holding in *Hamilton Die Cast* to the case before it, the *Coss* court stated: "In our present case, the defective materials and workmanship concededly produced an inferior home, just as the poorly designed frame produced an imperfect tennis racket. *Hamilton Die Cast* concludes that poor workmanship on the delivered product is not 'property damage' within the terms of the general comprehensive liability policy, and we agree." (*St. Paul Fire & Marine Ins. Co.* v. *Coss, supra*, 80 Cal.App.3d at p. 893.)

Like the courts in *Coss* and *Hamilton Die Cast* we do not believe inferior materials or workmanship themselves constitute "property damage." We

concede it is possible for a manufacturer or contractor to use inferior materials or methods without causing any property damage within the meaning of the Maryland policy. (See *Rafeiro* v. *American Employers' Ins. Co.,* *supra,* 5 Cal.App.3d 799, 808-809.) However, where the defect in fact has caused either physical injury to or the lost use of tangible property, liability coverage has been found. In *Geddes & Smith, Inc.* v. *St. Paul Mercury Indemnity Co.* (1959) 51 Cal.2d 558 [334 P.2d 881] (*Geddes*), the insured supplied a contractor with several hundred defective doors. In interpreting a coverage provision similar to Maryland's,[1] the Supreme Court found the door supplier's liability policy covered the cost of replacing the doors. The court relied upon the holding in *Hauenstein* v. *Saint Paul-Mercury Indem. Co.* (1954) 242 Minn. 354 [65 N.W.2d 122] (*Hauenstein*), where the insured supplied defective plaster which had to be removed so that the walls and ceiling could be replastered with a different material. In finding coverage the court in *Hauenstein* stated: "No one can reasonably contend that the application of a useless plaster, which has to be removed before the walls can be properly replastered, does not lower the market value of a building. Although the injury to the walls and ceilings can be rectified by removal of the defective plaster, nevertheless, the presence of the defective plaster on the walls and ceilings reduced the value of the building and constituted property damage. The measure of damages is the diminution in the market value of the building, or the cost of removing the defective plaster and restoring the building to its former condition plus any loss from deprival of use, whichever is the lesser." (65 N.W.2d at p. 125, fn. omitted.)

In relying on this statement from *Hauenstein* the plurality in *Geddes* court distinguished its earlier decision in *Volf,* where *Hauenstein* had also been considered. "In [*Volf*], a case involving defective plaster, we distinguished the *Hauenstein* case on the ground that in the *Volf* case it was not necessary to remove the defective plaster before replastering the house. In the present case, however, it was necessary to remove the defective doors before they could be replaced, and we see no reason for not following the *Hauenstein* case and permitting recovery for damages to the houses according to the rule stated therein." (*Geddes, supra,* 51 Cal.2d at p. 565; see also *W. E. O'Neil Const.* v. *National Union Fire Ins.* (N.D.Ill. 1989) 721 F.Supp. 984, 991-992.)

Here, of course, we have allegations of physical harm to tangible property. As we have seen, the homeowners and their association have alleged soil subsidence has cracked concrete floor slabs, foundations, retaining walls, interior and exterior walls and ceilings and exterior concrete patio areas.

---

[1] In *Geddes* the policy covered damages " 'because of injury to or destruction of property, including the loss of use thereof, caused by accident.' " (*Id.* at p. 563.) The court found that "property" as used in the policy "refers to physical or tangible property." (*Id.* at p. 566.)

Moreover failure of the roofing system has allegedly allowed rain water to damage building structures and the contents of living areas. Thus, like the claimants in *Geddes,* the homeowners and their association have gone beyond allegations that defects in material and workmanship exist at the project. Accordingly, the underlying plaintiffs have alleged property damage within the meaning of the insuring provisions of the Maryland policy.

III

*Work Performed*

By its terms exclusion "o" of Maryland policies eliminates coverage for "**property damage** to work performed *by or on behalf of the* **named insured** arising out of the work or any portion thereof, or out of materials, parts, or equipment furnished in connection therewith." (Italics added.) This language would eliminate coverage for most of the claims made by the homeowners and their association. (See *Maryland Casualty Co.* v. *Imperial Contracting Co.* (1989) 212 Cal.App.3d 712, 723-724 [260 Cal.Rptr. 797].) However, as we have seen, in addition to its comprehensive general liability policy, on some of the policies Maryland issued a broad form property damage endorsement. The endorsement replaces exclusion "o" with the following language: "with respect to the completed operations hazard and with respect to any classification stated in the policy or in the company's manual as 'including completed operations,' to property damage to work performed *by the* **named insured** arising out of such work or any portion thereof, or out of such materials, parts, or equipment furnished in connection therewith." (Italics added.) ▮ The insureds and the plaintiffs in the underlying proceedings argue that by eliminating the phrase "on behalf of the named insured," the endorsement provides coverage for claims arising out of work performed by subcontractors the developers and the contractor retained in developing the project. Because the insureds believe the claims made against them arise out of errors committed by soils engineers, graders and roofing subcontractors, they argue the policy provides them with coverage.

The insureds' interpretation of the endorsement is supported by the insurance industry's own construction of the broad form endorsement. As we have seen, the terms of the endorsement were drafted by the ISO, which also publishes circulars designed to explain the intent, purpose and effect of its standard form provisions. In one such circular the ISO explains the broad form endorsement is intended to "exclud[e] only damages caused by the named insured to his own work. Thus, . . . [t]he insured would have coverage for damage to his work arising out of a subcontractor's work [and]

[t]he insured would have coverage for damage to a subcontractor's work arising out of the subcontractor's work."

The effect of the endorsement was also explained in the August 1982, Fire Casualty & Surety Bulletin (FC & S bulletin) published by the National Underwriters Association. The FC & S bulletin is used by insurance agents and brokers to interpret standard insurance policy provisions. (*Fireguard Sprinkler Systems v. Scottsdale Ins.* (9th Cir. 1988) 864 F.2d 648, 652 (*Fireguard*).) According to the FC & S bulletin the work performed exclusion as it appears in the broad form endorsement "eliminates coverage for property damage to work performed by the named insured if the property damage arises out of the named insured's work or any portion of it. [¶]Thus, an insured *has* coverage for his completed work when the damage arises out of work performed by someone other than the named insured, such as a subcontractor . . . . The usual Completed Operations coverage (no Broad Form Property Damage endorsement attached) flatly excludes property damage to work performed by *or on behalf* of the named insured arising out of the work. Under the usual coverage, then, the insured has no insurance whatsoever for damage to a subcontractor's work, or for damage to his own work for damage resulting from a subcontractor's work. Therein lie the advantages of Broad Form Property Damage coverage including Completed Operations. Consequently, if an insured does not anticipate using subcontractors, the value of purchasing Broad Form Property Damage coverage *with Completed Operations* is questionable, in view of the additional premium required for it."

In addition to the ISO circular and FC & S bulletin, insurance industry commentators have also concluded the broad form endorsement provides coverage for work done by subcontractors. (See Gibson, Broad Form Property Damage Coverage: Analysis, Application and Alternatives 12-15 (2d ed. 1982); Audet, *Broad Form Completed Operations: An Extension of Coverage or a Trap?*, Canadian Underwriter (Oct. 1984) at p. 36.)

Significantly, relying on these insurance industry interpretations, the court in *Fireguard* found that a general contractor who installed a sprinkler system at a sawmill could recover on its liability policy for damage caused when a landslide destroyed the sprinkler system, including a water tank which was installed by subcontractors. (*Fireguard, supra*, 864 F.2d at p. 655.) The landslide was allegedly the result of improper engineering, site preparation and installation performed by the water tank subcontractors. (*Id.* at p. 649.) In finding coverage under the broad form endorsement for damage to the completed project caused by the subcontractors' work, the *Fireguard* court declined to follow two Minnesota cases, *Knutson* and *Borson Bldg. Corp. v. Employers Com. Union* (Minn. 1982) 323 N.W.2d 58

(*Bor-son*), which found the effect a subcontractors's work might have on a completed project was a business risk of the general contractor which could not be passed on to a liability insurer by way of the broad form endorsement.

In *Knutson* the Minnesota Supreme Court reasoned deletion of the phrase "on behalf of the named insured" was insignificant because " 'the insured contractor has presumably accepted the subcontractor's work as his own (at least so far as its potential tort liability is concerned), and has turned the completed work over to the owner by the time such a completed operations policy is operative.' " (396 N.W.2d at p. 237.)

In *Fireguard* the court rejected the Minnesota limitation on risks which may be covered by a liability policy. "If a general contractor's liability policy insures against risks outside his or her control, such a risk surely can arise from a subcontractor's work. Having selected subcontractors, a general contractor may have little or no effective control over the manner in which subcontractors perform work. There are many situations where a general contractor knows little, if anything, about the exigencies of a subcontractor's work. An example is the soil testing performed prior to a construction project, which typically is subcontracted. Consequently, it is not out of the question that policies are drafted to cover risks from a subcontractor's work. From this perspective, we find unpersuasive the argument that because the prime contractor's control makes the work of a subcontractor a contractual business risk, the prime contractor should not be able to obtain insurance against that risk." (864 F.2d at pp. 653-654.)

The *Fireguard* court also disagreed with *Knutson's* explanation of the significance of the phrase "on behalf of the named insured" and its absence in the endorsement. "We think [*Knutson's*] explanation does not square with the language of the endorsement: it ignores the careful drafting that characterizes insurance policies. Moreover, neither *Knutson* nor *Bor-son* refers to the industry's interpretation of the standard form exclusion, which is strong evidence of the intent of the parties."[2] (864 F.2d at p. 653.)

We agree with the analysis set forth in *Fireguard*. (See also *W. E. O'Neill Const.* v. *National Union Fire Ins., supra,* 721 F.Supp. at p. 996; see also *Mid-United Contr.* v. *Providence Lloyds* (Tex. App. 1988) 754 S.W.2d 824,

---

[2] At oral argument Maryland pointed out that in relying on the FC & S bulletin the court in *Fireguard* was employing Oregon law which permits use of extrinsic evidence even when contract language is not ambiguous. (*Fireguard, supra,* 864 F.2d at p. 651.) However, under California law reliance on the FC & S bulletin is appropriate under Civil Code section 1645 which provides: "Technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense."

827; *Southwest La.Ct.Grain* v. *Howard A. Duncan, Inc.* (La.Ct.App. 1983) 438 So.2d 215, 224.)[3] Like the Ninth Circuit, in the absence of unambiguous policy terms we are not inclined to restrict the risks for which businesses may obtain insurance and insurers may collect premiums. Moreover, as the *Fireguard* opinion points out, rather than any ambiguity, here there is compelling evidence from the insurance industry itself that the endorsement Maryland issued was drafted as a means of covering the very risk Maryland seeks to avoid. Accordingly, like the court in *Fireguard,* we find the broad form endorsement provides coverage for damage claims growing out of services provided by subcontractors retained during development of the condominium project.[4]

## IV

### Insured's Products

■ Next we consider the separate exclusion for an insured's products. Exclusion "n" of the Maryland policy eliminates coverage for "**property damage** to the **named insured's products** arising out of such products or any part of such products." The Maryland policy defines "named insured's products" as "goods or products manufactured, sold, handled or distributed by the **named insured** or by others trading under his name, including any container thereof [other than a vehicle], but 'named insured's products' shall not include a vending machine or any property other than such container, rented to or located for use of others but not sold." Maryland argues the entire condominium project was its named insureds' product and thus coverage of the claims made against them is barred by the exclusion.

Although Maryland's broad interpretation of the "products exclusion" is supported by a number of out-of-state authorities (see e.g. *Home Indemnity Company* v. *Miller* (8th Cir. 1968) 399 F.2d 78, 83-84; *Vobill Homes, Inc.* v. *Hartford Accident & Indem. Co.* (La.Ct.App. 1965) 179 So.2d 496, 497-498; *Kendall Plumbing, Inc.* v. *St. Paul Mercury Ins. Co.* (1962) 189 Kan. 528,

---

[3] We note the *Fireguard* opinion was decided on December 27, 1988, and hence was not available to the trial court at the time judgment in favor of Maryland was entered.

[4] As we have noted some of the Maryland policies do not have a broad form endorsement. Under our holding in *Maryland Casualty Co.* v. *Imperial Contracting Co., supra,* 212 Cal.App.3d 712, 723-724, those policies would not provide coverage for damage to work performed by or on behalf of the developers or contractors. However, in its notice of motion Maryland did not identify the coverage provided by particular policies as discrete issues on which it was seeking summary adjudication. Thus we do not have the power to direct the trial court to enter an order in Maryland's favor as to the coverage provided by particular policies. (See *Imperial Casualty & Indemnity Co.* v. *Sogomonian* (1988) 198 Cal.App.3d 169, 186 [243 Cal.Rptr 639]; Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (1989) §§ 10:41-10:45.)

531-532 [370 P.2d 396, 398-399]; *Indiana Ins. Co.* v. *Dezutti* (Ind. 1980) 408 N.E.2d 1275, 1280; *Federated Service Ins.* v. *R.E.W., Inc.* (1989) 53 Wn.App. 730, 735-736 [770 P.2d 654, 657]), it has been rejected by California cases which have discussed the issue. (See *Economy Lumber Co.* v. *Insurance Co. of North America* (1984) 157 Cal.App.3d 641, 650 [204 Cal.Rptr. 135]; *Owens Pacific Marine, Inc.* v. *Insurance Co. of North America* (1970) 12 Cal.App.3d 661, 666-668 [90 Cal.Rptr. 826] (*Owens Pacific Marine*); *Blackfield* v. *Underwriters at Lloyd's, London* (1966) 245 Cal.App.2d 271, 276 [53 Cal.Rptr. 838]; see also *Eichler Homes, Inc.* v. *Underwriters at Lloyd's, London* (1965) 238 Cal.App.2d 532, 538-539 [47 Cal.Rptr. 843].) Maryland's broad definition was also rejected by the court in *Fireguard*. (864 F.2d at p. 654.)

The court in *Owens Pacific Marine* conceded a products exclusion similar to Maryland's could be construed as applying to an entire boat constructed by an insured, thereby eliminating coverage for loss of the boat when a hot water heater exploded and the boat caught fire. However, after considering both out-of-state authority and California construction cases, the *Owens Pacific Marine* court found the products exclusion could also be construed as applying only to the hot water heater which failed and not to damage the water heater caused to the remainder of the boat. (12 Cal.App.3d at p. 668.) Given a reasonable interpretation of the clause which allowed coverage, the *Owens Pacific Marine* court affirmed a judgment in favor of the insured. (*Ibid.*)[5]

In *Fireguard* the insurer argued the products exclusion, identical to the one in Maryland's policy, applied to the entire sprinkler system. While acknowledging the water tank was a product, the *Fireguard* court found preparation of the water tank site was a "service" not covered by the exclusion. (864 F.2d at p. 654.) Thus the court refused to apply the exclusion to damage caused by errors in preparing the site or installing the tank. (*Ibid.*)

Like the courts in *Owens Pacific Marine* and *Fireguard*, we do not accept Maryland's broad interpretation of the products exclusion. In our view such

---

[5] The exclusion in *Owens Pacific Marine* excluded property damage to " 'any goods [or] products . . . sold, handled or distributed . . . by the named insured, or work completed by or for the named insured, out of which the accident arises.' " (12 Cal.App.3d at p. 665.) As the Maryland policies demonstrate, the work performed and product exclusions are now separate exclusions, thus eliminating any ambiguity when no broad form endorsement has been purchased. In the absence of the endorsement the work performed exclusion unambiguously excludes coverage for damage to any part of the goods or services provided by a general contractor or developer. (*Maryland Casualty Co.* v. *Imperial Contracting Co., supra,* 212 Cal.App.3d at pp. 723-724; *Western Employers Ins. Co.* v. *Arciero & Sons, Inc., supra,* 146 Cal.App.3d at p. 1031.)

an interpretation, by making no distinction between "products" and "work performed" ignores the fact the policy itself makes each category of commercial activity the subject of a separate exclusion. Maryland also ignores the fact the insured contractor, DMF, probably never conveyed anything to the property owner, but rather may have acted largely as an on-site manager of goods and services provided by others. Most importantly Maryland's interpretation ignores the fact the "work performed" exclusion, unlike the "products exclusion," was altered by the broad form endorsement to provide coverage for services supplied by subcontractors. If one exclusion was narrowed and the other was not, logic suggests there must be some difference between them. As in *Fireguard* we think the distinction arises and coverage exists when services, as opposed to discrete, tangible components, have caused injury. In this regard we note the August 1982 FC & S bulletin: "The editors have heard of instances in which insurers have denied coverage . . . on the ground that the policy exclusion of injury to the named insured's *products* [orig. italics] (which is not amended by the Broad Form endorsement) eliminates coverage for any damage to the completed building, the completed building being a 'product' of the named insured. In the opinion of the editors, that reasoning ignores the distinction between the 'completed operations hazard' and the 'named insured's products' in the policy definitions. *Moreover, that reasoning precludes any possibility of recovery under the Completed Operations feature of the Broad Form Endorsement, a feature for which the insured has presumably paid an additional premium.*" (Italics added.) In sum, then, because the damages claimed in the underlying lawsuits may have been caused by faulty services provided to the named insureds by subcontractors, the products exclusion does not apply as a matter of law.

## V

### *Alienated Premises*

■ In the trial court Maryland also argued it was entitled to summary judgment because the claims made against its insureds were within the terms of exclusion "l" of its policy. Exclusion "l" excludes coverage for "**property damage** to premises alienated by the **named insured** arising out of such premises or any part thereof." This exclusion, like the work performed and products exclusions, was also discussed in the August 1982 FC & S bulletin. According to the FC & S bulletin, in cases such as this, where in addition to the comprehensive general liability coverage an insured has purchased a broad form endorsement: "It is important to alert insureds—particularly those who buy land, build on it, and then sell the improved property—that the Broad Form Property Damage endorsement has no effect on the so-called Alienated Premises exclusion common to Premises

and Operations and Completed Operations Liability insurance. That exclusion eliminates coverage for property damage to premises alienated (e.g., sold) by the named insured, if the damage arises out of such premises or any part thereof.

"Say, for example, that the named insured buys a lot and then, acting as general contractor, builds a house on the lot. If, after the house is completed and sold, a subcontractor's faulty wiring causes the house to burn and the buyer sues the named insured for the costs of repairing the house, the named insured will have no coverage under Broad Form Property Damage (including Completed Operations) endorsement, due to the Alienated Premises exclusion. By the same token, if the same named insured had not been the owner of the property but only the general contractor, he would presumably have had coverage under his Broad Form endorsement for all property damage to the house other than, perhaps, the faulty work of the subcontractor or the 'particular part' of the subcontractors' work in which the fire originated."

Thus, under the insurance industry's interpretation of Maryland's alienated premises exclusion, coverage depends upon who owned the property. As the FC & S bulletin makes plain, where an insured is not an owner the exclusion does not apply. By way of a request for supplemental briefing we asked the parties to identify evidence in the record which would establish which insureds owned the property and when such insureds conveyed their interests. In response Maryland produced copies of recorded deeds which show a chain of title from Pearlman's acquisition (1972) to Gerald Frankel (1979) to Twelve Trees (in 1980) to individual buyers (between 1980 and 1985).

Although we take judicial notice of the recorded deeds (Evid. Code, § 459; *B & P Development Corp.* v. *City of Saratoga* (1986) 185 Cal.App.3d 949, 960 [230 Cal.Rptr. 192]), as to most of the insureds the deeds do not defeat coverage even under the 1982 FC & S interpretation. First the deeds do not show that DMF, the contractor, or Roundtree, Ltd., the partnership, were ever owners of the property. Even with respect to Roundtree Condominiums, the joint venture, the deeds only show the joint venture appeared as a co-grantor, along with Twelve Trees, to purchasers of individual units. The deeds Maryland produced do not show the joint venture was ever granted any interest in the property. If, in fact the joint venture was never an owner of the property and its appearance on the deeds was superfluous, arguably the alienated premises exclusion would not apply to it. Thus as to DMF, Roundtree, Ltd. and the joint venture, the alienated premises exclusion would not defeat coverage as a matter of law.

With respect to Pearlman, the deeds demonstrate the land was conveyed to him in 1972 and that he conveyed his interest in the project in 1979, before any of the Maryland policies were issued, and, the record suggests, before construction of the condominiums commenced. Given these circumstances application of the exclusion to Pearlman's prepolicy and preconstruction conveyance would likely render the policy illusory as to him. If his 1979 conveyance would defeat any coverage for the condominium project, it is difficult to understand why commencing in 1980 Maryland sold him a series of liability policies when there is no indication in the record Pearlman was involved in any other construction project.[6] Because we are counseled by general rules of contract interpretation to avoid a construction under which a contracting party receives no benefit from a contract (Civ. Code, §§ 1638, 1693; *SDR Co.* v. *Federal Ins. Co.* (1987) 196 Cal.App.3d 1433, 1437 [242 Cal.Rptr. 534]), we are unwilling to find Pearlman's 1979 conveyance gave rise to application of the alienated premises exclusion.

As to Twelve Trees, which conveyed the property after the policies were issued and after construction was completed, the interpretation offered by the 1982 FC & S bulletin plainly would exclude coverage. Twelve Trees would be protected for claims made during construction, but not for claims made after its conveyances. However in 1986 the alienated premises exclusion was altered to provide: "[This insurance does not apply to . . . 'property damage' to] (2) Premises you sell, give away or abandon, if the property damage' arises out of any party of those premises; . . . *Paragraph (2) of this exclusion does not apply if the premises are 'your work' and were never occupied, rented, or held for rental by you.*" (Italics added.) One commentator has suggested this change, which avoids any conflict with the prevailing interpretation of the broad form endorsement, was meant to clarify, rather than alter, the coverage excluded by the previous version of the alienated premises exclusion. (Gibson & McLendan, Commercial Liability Insurance, International Risk Management, Inc. (1988) pp. IV.D. 14 & V.E. 10-11.) Given the impact the 1982 FC & S interpretation has on coverage provided by a broad form endorsement, we are inclined to agree. Having paid an additional premium for broad form coverage, we believe an insured developer would expect to receive coverage of some additional risk. Accordingly we decline to apply the exclusion to Twelve Trees.

---

[6] We note that in its supplemental brief Maryland relies on *Rieder* v. *Cherokee Ins. Co.* (E.D.Pa. 1986) 635 F.Supp. 699, 700-702 (*Rieder*). In *Rieder* the court upheld application of the alienated premises exclusion where conveyance of a completed apartment project occurred before the subject policy was issued. Unlike the situation here, however, in *Rieder* there is no indication the insured was seeking protection solely for the very project which it had previously conveyed.

VI

*Joint  Venture*

In the trial court Maryland also relied upon a partnership and joint venture exclusion in its policies. The exclusion states: "This insurance does not apply **to bodily injury or property damage** arising out of the conduct of any partnership or joint venture of which the insured is a partner or member and which is not designated in this policy as a **named insured.**" As Maryland pointed out in the trial court, the purpose of the exclusion is to protect the insurer from hidden risks it did not consider in calculating an appropriate premium. (See *Austin P. Keller Const.* v. *Commercial Union* (Minn. 1986) 379 N.W.2d 533, 536 [57 A.L.R.4th 1147].)

Maryland argues that all the damage claimed by the homeowners arose out of the conduct of the Roundtree Condominium joint venture and that the joint venture is not named on any of the policies which include a broad form endorsement. However our review of two of the policies with the broad form endorsement discloses the insureds are identified as "Roundtree Ltd., a California partnership, & DMF Construction, Inc., A Joint Venture." Whether this inartful reference to "a joint venture" was intended or sufficient to provide Maryland with notice of the risks posed by the condominium project is a matter we cannot resolve on this record. Resolution of that question may turn upon who was responsible for providing such a description of the named insureds, whether Maryland had other notice that its insureds were doing business as a joint venture, and perhaps most importantly, whether the joint venture form of doing business adopted by the insureds materially altered Maryland's risk. (See *Maryland Casualty Co.* v. *Imperial Contracting Co., supra*, 212 Cal.App.3d at p. 725.)

CONCLUSION

Because claims for property damage were made against the named insureds and none of the exclusions Maryland relied upon eliminate coverage as a matter of law, the summary judgment entered in Maryland's favor must be reversed.

Judgment reversed; appellants to recover their costs.

Huffman, J., and Froehlich, J., concurred.

Respondent's petition for reiview by the Supreme Court was denied September 19, 1990.