LEWIS, C.J.,
concurring in result only.
While I agree with the result reached by the majority, I cannot fully subscribe to the reasoning. Sufficient ambiguity exists in these post-1986 commercial general liability (“CGL”) policies to afford coverage for insured contractors whose work is damaged by subcontractor negligence. See, e.g., State Farm Fire & Cas. Co. v. CTC Dev. Corp., 720 So.2d 1072, 1076 (Fla.1998) (“[W]here policy language is subject to differing interpretations, the term should be construed liberally in favor of the insured and strictly against the insurer.”). However, we must not overlook three major areas of concern with regard to emerging CGL jurisprudence. First, when one is attempting to determine and define the coverage afforded by any given insurance policy, the type of policy at issue must remain a central and critical concern. Second, courts, commentators, and parties to insurance contracts must remain wary of basing coverage determinations primarily upon the exclusions and exceptions within a contract, rather than upon the initial grant of coverage. Third and finally, the original function and scope of CGL policies *892 has been significantly altered, not by courts, commentators, or insureds, but by the insurance industry itself through drafting and marketing practices.
THE TYPE OF POLICY AT ISSUE.
It remains true that when an insurer fails to define a term in a policy, the insurer simply cannot validly assert that there should be a narrow and restrictive interpretation of the coverage provided under the contract. See, e.g., State Comprehensive Health Ass’n v. Carmichael, 706 So.2d 319, 320 (Fla. 4th DCA 1997). The coverage provided, however, must be gleaned in part from reference to the type of policy involved. Here, it should be remembered that “a commercial general liability insurance policy is generally designed to provide coverage for tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or work is not that for which the damaged person bargained.” 9A Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 129:1 (3d ed.2005) (emphasis supplied).
I do not suggest that I agree with the decisions from other jurisdictions which hold that the defective work of subcontractors can never result in an “occurrence” under a CGL policy. See, e.g., Auto-Owners Ins. Co. v. Home Pride Companies, Inc., 268 Neb. 528, 684 N.W.2d 571, 575-80 (2004); L-J, Inc. v. Bituminous Fire & Marine Ins. Co., 366 S.C. 117, 621 S.E.2d 33, 35-36 (2005). Rather, I caution that CGL coverage claims for those things other than the originally intended tort liability to third parties should be viewed with a cautious and suspect eye. See, e.g., 2 Jeffrey W. Stempel, Stempel on Insurance Contracts, § 14.01[B], at 14-17 (3d ed. 2007) (“The CGL, like most insurance policies, has a relatively targeted objective for insuring risks. It is designed to protect commercial operators from litigation and liability arising out of their business operations .... [T]he CGL is not designed to guarantee the quality of the policyholder’s work or the successful completion of its business activities.” (emphasis supplied)). Thus, in the interpretation of insurance policy language, as with the interpretation of any contract, one should remain cognizant of the type of policy or contract at issue and the type of coverage that is generally and naturally associated with such a policy. However, courts should only use interpretive tools to further the intent of the parties, not to usurp or contradict the language of the policy as written. See, e.g., Discover Prop. & Cas. Ins. Co. v. Beach Cars of W. Palm, Inc., 929 So.2d 729, 732 (Fla. 4th DCA 2006).
COVERAGE DETERMINATIONS SHOULD NOT BE MADE BASED UPON POLICY EXCLUSIONS.
The policy-interpretation linguistic gymnastics that tend to occur in some jurisdictions across the country in CGL cases, which involve the so-called subcontractor exception to the your-work exclusion, walk a very thin line of falling into violations of the rule that “exclusionary clauses cannot be relied upon to create coverage.” See, e.g., CTC, 720 So.2d at 1074. However, the insurance industry itself created the language which has necessitated much of this at times thin and often thought-provoking interpretation by drafting CGL forms in a fashion that has pushed insureds and courts to rely on language in the exclusions to give meaning to all the words in the policy and to decipher the coverage grants. See, e.g., Am. Family Mut. Ins. Co. v. Am. Girl, Inc., 268 Wis.2d 16, 673 N.W.2d 65, 73 (2004) (adopting a three-part approach to interpreting a CGL policy: (1) examine the initial coverage grant to determine if “property damage” or “bodily injury” has resulted from an “oc- *893 currenee”; (2) if “property damage” or “bodily injury” has occurred, examine the policy exclusions to see if the CGL policy’s otherwise broad coverage is thereby narrowed to exclude the claim; and finally (3) determine if any exceptions to applicable exclusions restore otherwise excluded coverage); Elmer W. Sawyer, Comprehensive Liability Insurance 11 (1943) (“[Ijnstead of insuring against only enumerated hazards, we now insure against all hazards not excluded.” (emphasis supplied)). Furthermore, the “Business-Risk Doctrine” or the “Historical Model” concept — the weapons upon which the insurance industry has generally relied to deny claims for faulty subcontractor work — simply do not appear anywhere in these post-1986 standard-form CGL policies, as demonstrated by the policy involved in J.S.U.B. See, e.g., ISO Policy Form Number CG 00 01 07 98, http://www.lexis.com; see also James Duffy O’Connor, WAai Every Construction Lawyer Should Know About CGL Coverage for Defective Construction, Constr. Law., Winter 2001, at 15, 15-16 (explaining that the Business-Risk Doctrine or Historical Model cannot be used to rewrite the actual language of the policy); 4 Philip L. Bruner & Patrick J. O’Connor, Jr., Bruner & O’Connor on Construction Law § 11:28 (2002 & Supp.2007) (substantially similar). These concepts should not be used to preclude coverage that the drafters of the policy intended and that insureds relied upon to justify paying additional premiums. Courts should not use the “concepts” of the Business-Risk Doctrine and Historic Model to simply bar coverage, in lieu of examining the policies as written. See Wanzek Constr., Inc. v. Employers Ins. of Wausau, 679 N.W.2d 322, 325-27 (Minn.2004) (avoiding this interpretive problem by modifying Minnesota’s view of the Business-Risk Doctrine in light of the changed policy language present in posb-1986 standard-form CGL policies).
It has become clear that if the insurance industry seeks to avoid further and expansive interpretations of its CGL policies, it must do a better job of more narrowly describing coverage and defining the type of “property damage,” “bodily injury,” and “occurrences” that it may intend these types of policies to cover, rather than adopting linguistic forms that tend to force courts to swim against the interpretive current by looking into the policy exclusions for answers to coverage questions to give meaning and life to all words utilized. Thus, while I am hesitant to place as much emphasis on the policies’ exclusions and exceptions as does the majority, I certainly recognize that courts should not rely on ephemeral policy justifications when the actual language of the policy at issue and the parties’ admitted intent do not include or reflect these justifications.
In these cases, this analysis leads me to the conclusion that we cannot simply rely on the Business-Risk Doctrine or Historical Model to deny the coverage claims of the insureds if neither the coverage grant nor the exclusions explain, reference, or use words to evidence these concepts in a manner that causes them to become controlling. The situation this Court faces, while facially complex, is actually fairly straightforward. The relevant CGL policy anticipates the “occurrence” of inadvertent (i.e., “neither expected nor intended”) events, which result in “property damage” or “bodily injury.” [12] The policies then fail *894 to outline the protections allegedly afforded as limited by the Business-Risk Doctrine or Historical Model, and the exclusions are ambiguous to the extent that we must find that they certainly do not exclude coverage for fortuitous damage that faulty subcontractor work causes to other portions of the completed project. If insurers wish to exclude this type of “occurrence” in this context, the onus is on them — not the courts — to clearly express that intent through the CGL policies they issue.
THE INSURANCE INDUSTRY HAS STRAYED FROM THE SCOPE OF COVERAGE ORIGINALLY PROVIDED BY CGL POLICIES.
Prior to the 1970s, there was minimal debate with regard to an expansive scope of coverage provided by CGL policies. Before that time, the wide-ranging consensus was that “[t]he coverage is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss.” Roger C. Henderson, Insurance Protection for Products Liability and Completed Operations — What Every Lawyer Should Know, 50 Neb. L.Rev. 415, 441 (1971). As I began my analysis of this case, that guiding principle directed my attention; however, it has become apparent that the insurance industry itself began to undermine that consensus, and maybe intentionally, in 1976 when it introduced the Broad Form Property Damage Endorsement (“BFPDE”), which altered the then-existing “your-work” exclusions. Specifically, the BFPDE extended coverage to general-contractor insureds for property damage caused by the work of their subcontractors, and decisions report that the industry has specifically acknowledged as much in its own publications. See, e.g., Md. Cas. Co. v. Reeder, 221 Cal.App.3d 961, 270 CaLRptr. 719, 725 (1990) (“[T]he ISO explains the broad form endorsement is intended to ‘exclud[e] only damages caused by the named insured to his own work. Thus, ... [t]he insured would have coverage for damage to his work arising out of a subcontractor’s work [and] [t]he insured would have coverage for damage to a subcontractor’s work arising out of the subcontractor’s work.’ ” (emphasis supplied)); see also James T. Hendrick & James P. Wiezel, The New Commercial General Liability Forms — An Introduction and Critique, 36 Fed’n Ins. & Corp. Couns. Q. 319, 360 (1986); National Underwriter Co., Fire, Casualty & Surety Bulletins, Public Liability Aa 16-17 (1993) (“FC & S Bulletin ”).
It appears that in 1986, the Insurance Services Office (“ISO”) issued the fifth major revision of the standard CGL policy form. 9A Russ & Segalla, supra § 129:1. As part of that revision, the ISO lifted the extended coverage provided by the BFPDE and directly incorporated it into *895 the standard CGL policy in the form of the so-called subcontractor exception to the your-work exclusion. See 21 Eric Mills Holmes, Holmes’ Appleman on Insurance § 132.9, 152-53 (2d ed.2002). As a direct result, the insurance industry continued to expand coverage for unintentional, contractual damages caused by subcontractors to the contractor-insured’s completed project. See, e.g., FC & S Bulletin Aa 16-17 (explaining that the ISO intended this exception to the your-work exclusion to provide coverage for damages caused to the insured-contractor’s completed work by the defective work of its subcontractors).[13]
Therefore, the scope of CGL policies has apparently been expanded to the extent that a CGL policy, which includes the subcontractor exception to the your-work ex-elusion, is in operation actually now the equivalent of a warranty or product coverage that affords protection for the contractors’ product and work.[14] Cf. Stempel, supra § 14.13[B], at 14-216 (“Performance bonds and CGL policies serve different purposes. The performance bond ensures against claims for defective workmanship while the CGL insures for personal injury claims based on acts or omissions of the policyholder. Courts are wary of permitting claimants or policyholders to receive CGL policy proceeds for what functionally are claims of defective construction .... ” (emphasis supplied)). It bears repeating, however, that traditional CGL policies were initially designed and intended to cover only tort liability for injuries sustained by third parties or their property, not contractual liability for products that fail to live up to the buyer’s expectations.[15] *896 Moreover, ostensibly expanding the scope of coverage by altering the exclusions and exceptions present in a CGL policy, instead of amending the coverage grant, is counterintuitive from a policy or contract interpretation standpoint, but again, these changes were the result of the deliberate efforts of the insurance industry.
I find this tortuous, indirect melding of the characteristics of different types of insurance coverages, performance bonds, and warranty-type protection to be somewhat inconsistent and inappropriate. However, if the insurance industry now seeks to place blame or fault for the current conditions, it need only look in the mirror: the industry has been a force in producing this apparent confusion, not the insureds and not the courts. The ISO appears to have begun the clean-up process by providing an endorsement to the standard post-1986 CGL policy, which eliminates the subcontractor exception to the your-work exclusion. See, e.g., Lamar Homes, Inc. v. Mid-Continent Cas. Co., 242 S.W.3d 1, 10-11 (Tex.2007). The true resolution to a continuing saga of litigation “of words,” however, is clarity of terms in all aspects of contract and policy preparation. The stacking of endorsements upon endorsements upon endorsements may or may not be the answer. Unfortunately, I suspect the latter.

. Opinions which assert that these CGL policies’ definition of “occurrence” somehow excludes coverage for fortuitous damage caused by faulty subcontractor work fail to support that position with reference to the actual language of the policies. See, e.g., L-J, Inc. v. Bituminous Fire & Marine Ins. Co., 366 S.C. 117, 621 S.E.2d 33, 34, 35-36 (2005) (without specifying which portions of a road project were completed by the subcontractors — who *894 ''perform[ed] most of the work” — court held that damage to the completed project did "not constitute an occurrence under a CGL policy”). Focusing on the definition of “occurrence” does not explain how that definition excludes coverage ab initio for fortuitous damage caused by faulty subcontractor work. Clearly, general contractors intend for subcontractors to complete their work, but they do not generally intend or anticipate that subcontractors will complete their work in a faulty manner, which later results in damage to the completed project. Moreover, any damage caused by subcontractor work that the insured "intended” or "expected” is already excluded under the standard CGL policy, which undermines the position that finding coverage in these types of cases provides general contractors with an incentive to render shoddy construction work. See, e.g., ISO Policy Form Number CG 00 01 07 98, exclusion a. ("This insurance does not apply to '[bjodily injury’ or 'property damage' expected or intended from the standpoint of the insured.” (emphasis supplied; internal division omitted)).

. I represent a prime exponent that CGL policies were originally intended solely to cover damages that the insured's operations caused to third parties' persons or property. However, there is substantial evidence, which I and the majority have noted, that the insurance industry itself altered this original intent by extending coverage — albeit in a convoluted fashion — to insureds for fortuitous damage caused to their completed projects by faulty subcontractor work. Opinions that hold otherwise regarding standard-form post-1986 CGL policies do not address the evidence in this and other more recent CGL cases, which indicates that this extension of coverage, while inartfully executed, is exactly what the parties have accomplished — and intended to accomplish — by altering the your-work exclusions to no longer exclude the type of coverage disputed in these cases. The law requires that we rely on the plain language of the policy’s coverage provision, the ambiguity of the exclusions, and the ample evidence of the parties' intent to support the proposition that the policy does not clearly exclude otherwise-present coverage for fortuitous damage caused by faulty subcontractor work.

. With the increasing probability that current construction practices will result in construction projects entirely completed by subcontractors, many distinctions between work and product protection and CGL policies that include the subcontractor exception may have disappeared. The majority is correct that the owner-obligee is the direct beneficiary under a performance-bond type protection, but the same functional situation obtains when a disappointed owner sues a general contractor, who then requests coverage from its CGL insurer; the owner becomes the beneficiary of the CGL policy. This too is counter to CGL policies’ original function, which was to provide tort-liability coverage for injuries caused to third parties’ persons and property. However, this result appears to have been the intent of the parties due to the words of the contract and other supporting evidence.

.Insurers attempt to draft coverage language with a degree of precision. Liability insurance is intended to insure the policyholder against the consequences of third-party claims, while other types of insurance have traditionally insured against different types of risks. “To maintain this division of labor or compartmentalization, insurers draft liability policies with an eye toward preventing policyholders from obtaining first-party type protections from their liability insurance or converting their liability insurance into protection from nonfortuitous losses such as claims based on poor business operations.” Stempel, supra§ 14.13, at 14-211.