KVAERNER METALS DIVISION OF KVAERNER U.S., INC. f/k/a Kvaerner Davy Division of Kvaerner U.S. Inc. f/k/a Davy International, a Division of Trafalgar House, Inc. and Kvaerner Songer, Inc., f/k/a Kvaerner Davy Songer, Inc. f/k/a Kvaerner Davy Songer, Inc. f/k/a Davy Songer, Inc., Together a Joint Venture; Kvaerner Metals Division of Kvaerner U.S., Inc. f/k/a Kvaerner Davy Division of Kvaerner U.S., Inc. f/k/a Davy International, a Division of Trafalgar House, Inc., Kvaerner Songer, Inc., f/k/a Kvaerner Davy Songer, Inc. f/k/a Davy Songer, Inc.; Kvaerner Public Liability Company f/k/a Trafalgar House Public Liability Company; and Kvaerner ASA, Appellants,

v.

COMMERCIAL UNION INSURANCE COMPANY; Lexington Insurance Company; National Union Fire Insurance Company of Pittsburgh, PA; Bethlehem Steel Corporation; Thyssen Still Otto Anlagentechnick GMBH, Successor–In–Interest to Still Otto, GMBH, Appellee.

Superior Court of Pennsylvania.

Argued Feb. 26, 2002.

Filed April 16, 2003.

Reargument Denied June 30, 2003.

Joseph L. Luciana, Pittsburgh, for appellants.

Michael J. Cawley, Philadelphia, for National Union, appellee.

BEFORE: McEWEN, P.J.E., LALLY-GREEN, and BENDER, JJ.

OPINION BY McEWEN, P.J.E.:

¶ 1 These appeals have been taken by Kvaerner Metals Division of Kvaerner, U.S., Kvaerner Songer, Inc., Kvaerner Public Liability Company and Kvaerner, ASA, and certain related companies (hereinafter "Kvaerner"), from the order which granted summary judgment in favor of appellee National Union Insurance Company of Pittsburgh, PA, (hereinafter "National Union"), in this declaratory judgment action instituted to resolve coverage issues arising out of two commercial general liability insurance policies issued to Kvaerner by National Union. We are constrained to reverse and remand.

¶ 2 Kvaerner filed this declaratory judgment action in the Court of Common Pleas of Northampton County as a result of a claim against Kvaerner made by Bethlehem Steel seeking reimbursement for damages allegedly sustained by a coke battery, known as the Burns Harbor No. 2 Coke Oven Battery, built for Bethlehem Steel by Kvaerner. Commercial Insurance Company, Lexington Insurance Company,[1] and National Union Fire Insurance Company of Pittsburgh, PA, had each is-sued policies to Kvaerner under which Kvaerner sought coverage for the claims asserted against it by Bethlehem Steel.

¶ 3 Bethlehem had filed suit in the Court of Common Pleas of Northampton County against Kvaerner, and its subcontractor, Thyssen Still Otto Anlagentechnick (hereinafter "TSOA"), to recover damages for injuries allegedly sustained by Bethlehem's Burns Harbor No. 2 Coke Oven Battery which had been the subject of a design build contract which Kvaerner had entered into with Bethlehem Steel.[2]

¶ 4 The parties are in agreement that Kvaerner entered into a subcontract with Thyssen Still Otto Anlagentechnick (hereinafter "TSOA") which provided for TSOA to provide the design and engineering of the battery and to supervise the initial heat-up of the coke oven.

¶ 5 National Union, which had issued two very similar commercial general liability (hereinafter "CGL") insurance policies to Kvaerner covering the time periods and contract at issue, filed a motion for summary judgment arguing that the claims asserted against Kvaerner by Bethlehem Steel were purely contractual claims that were not within the coverages afforded to Kvaerner by the CGL policies. Kvaerner filed a cross-motion for summary judgment claiming it was entitled to both a defense and indemnity in the Bethlehem action. The trial court entered summary judgment in favor of National Union, based upon its conclusion that the claims asserted against Kvaerner by Bethlehem Steel were not within the coverages afforded by the CGL policies because there had been no "occurrence" as required under

---

1. Commercial Union and Lexington Insurance Company settled with Kvaerner and are no longer involved in this litigation.

2. Bethlehem's suit was settled in March of 2001 and Kvaerner continued with the instant declaratory judgment action seeking the costs incurred in defending and settling the Bethlehem action.

the policies to invoke coverage, but rather only a failure to perform pursuant to contractual requirements. Thus, the trial court did not reach the issue of the applicability of certain exclusions also relied upon by National Union.

¶6 Kvaerner contends the trial court erred when it entered summary judgment in favor of National Union based on the conclusion of the court (1) that the policy requirement of an "occurrence" had not been met, and (2) that Kvaerner was improperly seeking coverage for a dispute arising out of the failure to properly perform according to the terms of its contract with Bethlehem. The trial court relied upon *Redevelopment Authority of Cambria County v. International Insurance Co., et al.*, 454 Pa.Super. 374, 685 A.2d 581 (1996) (en banc), *appeal denied*, 548 Pa. 649, 695 A.2d 787 (1997), in concluding that there had been no occurrence and that Bethlehem's claim arose solely out of a failure to perform according to contractual requirements. As we find that the trial court erred when it concluded as a matter of law that there had been no "occurrence" triggering coverage under the policies, we are constrained to reverse and remand.

¶7 We must be mindful as we resolve this coverage dispute that:

The standards to be applied in reviewing coverage questions arising under insurance contracts are well settled. "The proper focus regarding issues of coverage under insurance contracts is the reasonable expectation of the insured. In determining the reasonable expectations of the insured, courts must examine the totality of the insurance transaction involved." *Hertz Corporation v. Smith,* [441 Pa.Super. 575] at 578, 657 A.2d

[1316] at 1317 (1995) (citations omitted). *Accord: Britamco Underwriters, Inc. v. Weiner,* 431 Pa.Super. 276, 636 A.2d 649 (1994), *allo. [sic] denied,* 540 Pa. 575, 655 A.2d 508 (1994); *Dibble v. Security of America Life Ins. Co.,* 404 Pa.Super. 205, 210, 590 A.2d 352, 354 (1991). While a determination as to the reasonable expectations of the insured must be based upon the totality of the insurance transaction involved, an insured may not complain that his or her reasonable expectations were frustrated by policy limitations which are clear and unambiguous. *Bateman v. Motorists Mutual Ins. Co.,* 527 Pa. 241, 244–246, 590 A.2d 281, 283 (1991); *St. Paul Mercury Insurance Co. v. Corbett,* 428 Pa.Super. 54, 58–60, 630 A.2d 28, 30 (1993). However, where a provision of an insurance policy is ambiguous, the provision is to be construed in favor of the insured and against the insurer. *Britamco Underwriters, Inc. v. Weiner, supra; Bateman v. Motorists Mut. Ins. Co., supra* at 244–246, 590 A.2d at 283; *Madison Construction Co. v. The Harleysville Mutual Insurance Co.,* [451 Pa.Super.] at 142, 678 A.2d at 805.

*Redevelopment Authority of Cambria County v. International Insurance Co., supra,* 685 A.2d at 588.

¶8 The policies at issue, National Union's Policy No. RMGLCM 121–30–11 with a policy period of September 30, 1995, to September 30, 1996, (hereinafter "1996 CGL policy") and policy No. RMGL143–84–29 RA with a policy period of March 27, 1997, to December 31, 1997 (hereinafter "1997 CGL policy"),[3] were issued with specific reference to the Bethlehem project,

---

**3.** Kvaerner paid National Union $2,571,388 for $5,000,000 of coverage from March 27, 1997, to December 31, 1997, for the 1997 CGL policy, and for the same coverages paid $3,756,876.00 for the 1996 CGL policy with a policy period from September, 30, 1995 to September 30, 1996.

and will be treated as a single policy for purposes of this appeal. The following citations, however, refer to the 1997 CGL policy.

¶ 9 Coverage A provided liability coverage for bodily injury and property damage caused by an "occurrence" as follows:

COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. Insuring Agreement.

\* \* \* \*

b. This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory;"

An "occurrence" is defined by the policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

¶ 10 This broad coverage was limited by the following exclusions set forth in the policy and specifically relied upon by appellee National Union in its motion for summary judgment:

2. Exclusions

This insurance does not apply to:

\* \* \* \*

j. Damage to Property

\* \* \* \*

(6) **That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.**

\* \* \* \*

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

k. Damage to Your Product

"Property damage" to "your product" arising out of it or any part of it.

l. Damage to Your Work

**"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."** (emphasis supplied)

m. Damage to Impaired Property or Property Not Physically Injured

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work," or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

**This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.** (emphasis supplied)

¶ 11 Although not set forth in the body of appellee National Union's motion for summary judgment, the policies issued to Kvaerner further provided:

14. "Products-completed operations hazard"

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the site has been completed if your contract calls for work at more than one site.

(c) When that part of the work done at a job site had been put to its intended use by any person or organization other than another contractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

\* \* \* \*

15. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

\* \* \* \*

19. "Your work" means:

a. **Work or operations performed by you or on your behalf;** and [emphasis supplied]

b. Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work," and

b. The providing of or failure to provide warnings or instructions.

¶ 12 The "products-completed operations hazard" clause operates, *inter alia,* to provide coverage for property damage to the property of others caused by an "occurrence", occurring away from the insured's premises, arising out of the insured's product or work. Any damage to the work product of the insured is, however, expressly excluded from coverage by the terms of the policy. Kvaerner's work is defined by the policy to include all work performed BY OR ON BEHALF of Kvaerner. As a result, the *entire* battery, being built by Kvaerner or its subcontractors, is included in the products-completed operations hazard clause and any damage to the battery itself is expressly excluded from coverage by virtue of the products completed operations hazard. *See: Snyder Heating Co., Inc. v. Pennsylvania Manufacturers' Ass'n Insurance Co.,* 715 A.2d 483, 486 (Pa.Super.1998). Thus, unless there is an endorsement to the policy restoring coverage for the battery, summary judgment was properly entered in favor of National Union, regardless of whether there was an occurrence.

¶ 13 Kvaerner claims, however, that an endorsement first adopted by the insurance industry in 1986 and included in the policies issued to Kvaerner by National Union operated to narrow the scope of the "products-completed operations hazard" clause to encompass (1) only that part of the work actually performed by Kvaerner, and (2) only that part of Kvaerner's work which was defective or which actively malfunctioned.

¶ 14 The trial court, as a result of its conclusion that there had been no "occurrence" as required to trigger coverage, never reached the issue of the effect of Endorsement 16 which provided:

It is hereby understood and agreed that Section I, Coverage A., 2 Exclusion, l. ["Exclusion l"] is deleted and replaced with the following:

"Property Damage" to that particular part of "your work" that is defective or actively malfunctions.

**This exclusion applies only to the "products-completed operations" hazard. It does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.** (emphasis supplied)

¶ 15 Kvaerner argues that the physical damage sustained by the battery after it was placed in service and heated up was an "occurrence" caused, at least in part, by (a) torrential rains which occurred on October 31 and November 1, 1994,[4] which resulted in a mortar washout, and (b) by improper adjustment of the longitudinal tie rod springs during the heating up of the battery which caused deflection and deformation of the upper brickwork of the battery roof.[5] Kvaerner contends that the policies as written with the inclusion of

Endorsement 16 provide coverage for damage to (1) Kvaerner's **non-defective completed work** that was damaged as a result of any defective work, and (2) also provides coverage for any **defective work** performed on behalf of Kvaerner by its subcontractor, TSOA.

¶ 16 Our scope of review of the legal issues presented by this appeal is plenary:

Although we are reviewing the trial court's interpretation of the instant policy in light of the claims raised in the underlying complaint, we need not defer to the trial court's finding since the construction of a contract of insurance is a question of law. *United Services Automobile Association v. Elitzky,* 358 Pa.Super. 362, 517 A.2d 982, 985 (1986), *alloc. denied,* 515 Pa. 600, 528 A.2d 957 (1987). Our primary purpose in interpreting such contracts is to 'ascertain the intent of the parties as manifested by the language of the written agreement.' *American States Insurance Co. v. Maryland Casualty Co.,* 427 Pa.Super. 170, 628 A.2d 880, 886 (1993) (quoting *Standard Venetian Blind Co. v. American Empire Insurance Co.,* 503 Pa. 300, 305 469 A.2d 563, 566 (1983)). If the policy language is clear, such language is given effect by the court. *Id.*

4. The torrential rain allegedly caused damage to the mortar between the bricks of the battery.

5. A joint task force report to assess, *inter alia,* the causes of the defects in the battery was issued as a result of a joint investigation undertaken by Bethlehem Steel, Kvaerner and TSOA. That report lists:

Four possible causes for the residual longitudinal expansion of the battery roof:

● Partial loss of the capability to compensate for the longitudinal expansion into the expansion joints due to ingress of rain water, combined with washing of mortar into expansion joints.

● Partial loss of the capability to compensate for the longitudinal expansion into the expansion joints due to the premature grouting of the battery top.
● Heating rate for the battery.
● Adjustments of the longitudinal tie rods.

Based on the Task Force's investigation of the heat-up and construction activities, the Task Force found that the battery top was grouted prematurely and that a torrential rain during the relevant period may have resulted in an ingress of rainwater and washing of mortar into the expansion joints.

If the language is ambiguous, however, we will construe the agreement against the drafter. *Insurance Co. of Pennsylvania v. Hampton,* 441 Pa.Super. 382, 385, 657 A.2d 976, 978, *alloc. denied,* 542 Pa. 647, 666 A.2d 1056 (1995).

*Belser v. Rockwood Casualty Insurance Co.,* 791 A.2d 1216, 1220 (Pa.Super.2002), *quoting Board of Public Education of the School of Pittsburgh v. National Union Fire Insurance Co.,* 709 A.2d 910, 913 (Pa.Super.1998)(en banc).

[T]he goal of interpreting an insurance policy, like the goal of interpreting any other contract, is to determine the intent of the parties as manifested by the language of the policy, *see Madison [Construction Co. v. Harleysville Mut. Ins. Co.],* 557 Pa. at 606, 735 A.2d at 106 (*quoting Gene & Harvey Builders v. Pennsylvania Mfrs. Ass'n,* 512 Pa. 420, 426, 517 A.2d 910, 913 (1986)), .... Whether ambiguity exists cannot be resolved in a vacuum, we noted, but must instead be considered in reference to a specific set of facts. *See id.*

\* \* \* \*

Any such inconsistency in meaning simply indicates, however, that the exclusionary language does not clearly include or exclude the physical process here at issue, but is, as to that process, ambiguous. Such ambiguity requires that the language be interpreted in favor of the insured.

*Lititz Mutual Insurance Co. v. Steely,* 567 Pa. 98, 103–104, 110, 785 A.2d 975, 978, 982 (2001).

¶ 17 Under the CGL policies [6] issued by National Union to Kvaerner, National Union agreed to defend and, if necessary, indemnify Kvaerner for "property dam-

age" caused by an "occurrence", unless the injury and damage was otherwise excluded by the terms of the policy.

¶ 18 An "occurrence" is defined by the policies as "an accident, including continuous and repeated exposure to substantially the same general harmful conditions." Property damage is defined as "physical injury to tangible property, including all resulting loss of use of that property" or "loss of use of tangible property that is not physically injured." Thus, our initial inquiry is whether Bethlehem sought compensation for physical injury to its property caused by an occurrence.

¶ 19 Kvaerner, in support of its cross-motion for summary judgment and in opposition to National Union's motion for summary judgment, produced an expert report authored by Dr. Clayton Liu and Chuck Beachan, members of Bethlehem's Research Department. That report "on the condition of the Battery and the causes for that condition, including but not limited to the impact of premature grouting", stated:

. . .

4. In our opinion the grouting of the Battery was premature, as it occurred prior to completion of brick expansion. In our opinion it is necessary to provide space for expansion of brick in order to preserve the integrity of any refractory structure. In addition, the requirement that grouting take place upon completion of expansion is set forth in the drawings. The premature and segmented grouting caused displacement and movement of the roof which has sheared and weakened the joints and the roof structure. As a result of the premature and segmented

---

**6.** The language of CGL policies at issue in this case is in most instances identical to the language used in CGL policies throughout the U.S.

grouting the roof has open joints and the flues have ledges of a size and orientation that are unique and that indicate that distortion has occurred. Also as a result of the premature and segmented grouting, coke oven gas is leaking into the roof and the flue ports. The displacement and movement of the roof has also led to tilting and bowing of the oven walls.

5. In our opinion, based on Bethlehem Steel's experience using the laser survey technology to survey the contours of refractory walls in other steel applications, and based on Geotronics' expert report on the surveys, laser surveys are a reliable method for determining the contour of coke oven walls.

6. Based on our observations of the leaks, based on the Report and Interpretation by UEC of its analysis of the tar-like material obtained from the flues at the Battery, and based on our examination of mortar samples retrieved from the flue inspection ports, in our opinion coke oven gas has been migrating from the ovens into the flues.

7. In our opinion, the very early appearance of the ledges and leakage, as well as the orientation and distribution of the ledges are a result of the distortion and movement of the roof brick that was caused by the lack of expansion space during heat-up.

8. In our opinion, the changes and movements in the Battery block revealed by analysis of the annual Cole Survey and ICF Kaiser inspections of the Battery mean that the Battery is not stable.

9. Based on our tests of the impact of water on the mortar used for the fireclay refractory, the heavy "monsoon-type" rain which occurred October 31 could have damaged the joints in the roof.

¶ 20 Kvaerner, in a letter dated September 4, 1996, prior to the institution of any litigation advised their insurance broker to

[P]lace the CGL carriers on notice of the potential claim by Bethlehem Steel for damage caused by roof expansion of the coke oven battery project recently completed by Davy International/Davy Songer.

\* \* \* \*

... [T]he claim involves damages which are being claimed by Bethlehem Steel as a result of uneven expansion of the roof and walls of the coke oven battery following heat up....

¶ 21 National Union, in its motion for summary judgment requested a ruling from the trial court (1) that National Union had neither a duty to defend nor a duty to indemnify Kvaerner against Bethlehem's claim, because there had been no "occurrence" but only a failure to perform according to contract requirements, or in the alternative, (2) that, even if there had been an "occurrence", the "Business Risk/Work Product" exclusions contained in the policies issued to Kvaerner excluded coverage for damages to the battery.

¶ 22 Nowhere in National Union's motion for summary judgment did it allege that there were no disputed issues of material fact, despite the well settled rule that summary judgment may not be entered where there are material facts in dispute. However, in response to Kvaerner's motion for summary judgment, National Union responded,[7] *inter alia:*

7. National Union had alleged in its Motion for Summary Judgment that *"during the initial*

it is denied as a conclusion of law that the Battery was put to its intended use by BSC [Bethlehem Steel Corporation] on December 17, 1994, and, therefore, Kvaerner's work was completed as of December 17, 1994. *At a minimum, there remains a fact issue* of whether BSC ever put the Battery to its intended use, especially given the non-compliance of September 15, 1995, November 14, 1996, and February 12, 1997"

(Para. 5 of National Union's Answer to Kvaerner's motion for summary judgment) (emphasis supplied).

¶ 23 Kvaerner, in response to National Union's motion for summary judgment and in support of it cross-motion, submitted the affidavit of John Nichols, Kvaerner Project Director for the Burns Harbor No. 2 Coke Battery rebuild project, who averred:

. . .

3. During the period from December 1992 to October 1994, Kvaerner (with the assistance of its subcontractor, TSOA) designed, engineered and constructed the Battery, including the brick oven walls and brick roof. . . .

4. After construction of the brick work was substantially completed (except for trim work), beginning in October 1994, the Battery was put through a 70–day heat-up and commissioning process during which the ovens were heated from ambient temperature to the operating temperature of approximately 2,200 degree Fahrenheit, *charged with coal and used to make first coke.* [emphasis supplied]

5. Kvaerner achieved timely completion of construction, heat-up and commissioning of the Battery.

6. During construction of the brick work of the Battery from approximately February 1993 to October 1994:(1) Kvaerner constructed the roof brick without cracks, (2) Kvaerner constructed the transverse tied rods in a straight condition, (3) Kvaerner constructed the inspection walls in the roof in an unbowed condition, and (4) Kvaerner constructed the oven walls without tilts, bulges or cracks.

7. Kvaerner obtained the approval of TSOA before it grouted the expansion joints in the roof of the Battery. Kvaerner did not expect or intend that the grouting of the roof would cause damage to the roof, oven walls or roof structures.

¶ 24 Initially, we are required to determine whether the coke battery was subject to an "occurrence" triggering coverage under the policies issued by appellee. Our inquiry is made vexing by the substantial body of case law holding that "[a] carrier's duties to defend and indemnify an insured in a suit brought by a third party depends upon a determination of whether the third party's *complaint* triggers coverage." *Mutual Benefit Insurance Co. v. Haver*, 555 Pa. 534, 538, 725 A.2d 743, 745 (1999) (emphasis supplied).

¶ 25 The Supreme Court in *Mutual Benefit Insurance Co., id.*, held that "to allow the manner in which the complainant frames the request for redress to control in a case such as this one would encourage litigation through the use of artful pleadings designed to avoid exclu-

*operation of the Battery,* BSC [Bethlehem Steel Corporation] reported raw gas leakage on the Battery roof. BSC contends that it

gave timely written notice to Kvaerner of the defects to the Battery constructed by Kvaerner." (emphasis supplied)

sions in liability insurance policies." *Id.* at 539, 725 A.2d at 745. As ably argued by National Union, the complaint eventually filed in the instant case by Bethlehem Steel appears to set forth a claim arising from a failure to properly perform under a contract. As this Court noted in *Redevelopment Authority, supra,* an insurer has no duty to an insured where

> the underlying suit arises out of a breach of contract which is not an accident or occurrence contemplated or covered by the provisions of a general liability policy.

> \* \* \* \*

Our review of the applicable case law from this and other jurisdictions compels the conclusion that Erie correctly asserts that it has no duty to defend or indemnify the Authority since the underlying suit arises out of a breach of contract which is not an accident or occurrence contemplated or covered by the provisions of a general liability insurance policy. While Barr Township and the MCWA have employed negligence concepts in drafting their complaint, it cannot be disputed that their claims arise out of and are based upon duties imposed upon the Authority solely as a result of the contract between the Authority and Barr Township through the MCWA. The complaint, as drafted by Barr Township and the MCWA, seeks damages allegedly caused by the failure of the Authority to perform the duties set forth in its contract with the Township, alleging, *inter alia,* that the Authority "did not properly perform its duties ..., but did so negligently, carelessly and unskillfully and thereby failed to perform its duty, which failure was the proximate cause of [Barr Township's] injuries ...."

*Redevelopment Authority of Cambria County v. International Insurance Co., supra* at 589. The reason that such coverage is not provided by CGL policies is that

> [s]uch policies are intended to protect against limited risks and are not intended to act as performance bonds.

> \* \* \* \*

> ... The purpose of a work products exclusion in a commercial liability insurance policy is to distribute the risks contemplated in the production or construction of a product so that if the product itself is flawed because of the failure of the insured (herein the appellee builders) in the work process, the insured must repair or replace it, but if the product's failure causes injury or damage to third parties, the insurer (herein Erie) is responsible for indemnification of the loss.

*Ryan Homes, Inc. v. Home Indemnity Co.,* 436 Pa.Super. 342, 647 A.2d 939, 942, 944 (1994), *appeal denied,* 540 Pa. 621, 657 A.2d 491 (1995), *quoting Carpenter v. Federal Insurance Co.,* 432 Pa.Super. 111, 637 A.2d 1008, 1014 (1994). *Accord: Keystone Filler & Manufacturing Co., Inc. v. American Mining Insurance Co.,* 179 F.Supp.2d 432, 439 (M.D.Pa.2002), *aff'd,* 55 Fed.Appx. 600, 2002 WL 31894948 (3d Cir.2002).

¶ 26 The claim at issue in *Redevelopment,* unlike the claim at issue in the instant case, was a failure to properly administer community block grant funds so as to ensure that the township water system complied with DER (Department of Environmental Resources) standards. There was no "occurrence" and no damage of any kind to tangible property at issue in the *Redevelopment* action.

¶ 27 Unlike the claims in *Redevelopment,* the claims submitted by Kvaerner include sudden damage to physical property. Additionally, unlike *Redevelopment*

where the only claim was a failure to perform administrative duties, all of the expert reports generated prior to and during the Bethlehem Steel litigation ascribe at least a portion of the physical damage sustained by the battery to the torrential rains of October 31st and November 1st. Since there is *no* requirement in the CGL policies that a civil complaint be filed to trigger coverage under the policies, and since the battery deformities caused by the migration of mortar as a result of unusual, torrential rains clearly constitute an "occurrence" under the policy, we are unable to agree with the conclusion of the trial court that because there had been no "occurrence" which caused property damage, summary judgment could be entered as a matter of law. Moreover, as there presently exists an actual factual controversy over the *cause* of damage, as well as whether the battery had been placed in service, summary judgment could not be properly entered.

¶ 28 The distinguished Judge C. Tolbert Goolsby, Jr., writing for the South Carolina Court of Appeals in a declaratory judgment action arising out of a coverage dispute involving a construction contract, perceptively addressed both of the issues presented by the instant controversy, *i.e.*, (1) whether there had been an "occurrence" as required under the policies to trigger coverage, and (2) whether the endorsement adopted in 1986 by the insurance industry and included in the policies at issue in this case, operated to remove all work performed by a subcontractor from the coverages exclusion included in the "products-completed operations hazard".[8]

¶ 29 The underlying contract at issue in *L–J, Inc. v. Bituminous Fire and Marine*

*Insurance Co.,* 350 S.C. 549, 567 S.E.2d 489 (S.C.Ct.App.2002), provided for Eagle Creek, the general contractor, to develop the site and to construct the roads for a subdivision. Eagle Creek hired a subcontractor, U.S. Construction Co., Inc. (U.S. Construction), to clear, grub, rough grade, fine grade and construct the sub-base and the base for the roads of the subdivision. U.S. Construction in turn hired certain other subcontractors to perform some of the tasks subcontracted to U.S. Construction by Eagle Creek. Eagle Creek and its subcontractors completed the roads pursuant to the terms of the contract, but four years later the road surfaces had deteriorated and failed as a result of drainage problems and an inadequate subgrade caused primarily by tree stumps which had been left in the roadbed.

¶ 30 The subdivision filed suit against Eagle Creek, which joined the subcontractors. Only one of Eagle Creek's insurers, Bituminous,[9] denied coverage and after settlement of the underlying action, Eagle Creek and its other insurers brought suit against Bituminous seeking indemnification. The legendary Judge Goolsby, in the appeal from the verdict, astutely opined:

> In this case, it is undisputed that repeated exposure to surface water runoff caused the pavement to fail. The pavement is tangible property. The policy provides coverage for continuous and repeated exposure to harmful conditions causing damage to tangible property. Under the clear language of the policy, the repeated exposure to water is an "accident" and therefore an "occurrence."
>
> It is further undisputed L–J did not perform the work on the sub-road. The

---

**8.** Discussed *infra*.

**9.** Bituminous' policy definition of occurrence was identical to the definition contained in

the policy issued to Kvaerner by National Union in the instant case.

work was performed by subcontractors. There is no evidence L–J knew of the problems with the sub-road until the surface pavement damage became apparent years later. Because L–J did not improperly construct the sub-road or have knowledge of the improper construction, there is no evidence that L–J expected or intended that the pavement would fail. Under the plain and unambiguous language of the policy, there is an "occurrence." [fn 6]

[fn 6] *See Kalchthaler v. Keller Constr. Co.*, 224 Wis.2d 387, 591 N.W.2d 169 (Wis.Ct.App.1999) (finding water damage to interior of building from defectively installed window was an 'occurrence').

Bituminous argues, however, that the policy language regarding the definition of "occurrence" should be construed in light of the business risk doctrine.

The business risk doctrine is the expression of a public policy applied to the insurance coverage provided under commercial general liability policies. Reduced to its simplest terms, the risk that an insured's product will not meet contractual standards is a business risk not covered by a general liability policy.

\* \* \* \*

Significantly, under the business risk doctrine, harm to the property of a third party caused by the insured's defective work is *not* excluded from coverage.[footnote omitted]

Relying on this doctrine, Bituminous disregards the damage to the pavement and contends that faulty workmanship alone is at issue and that there was therefore no "occurrence".[fn 8] Bituminous also argues that faulty workmanship can never be an "occurrence" under a comprehensive general liability (CGL) policy.

[fn 8] As noted in a recent article:

The CGL policy expressly states that it is the "property damage" for which the plaintiff seeks recovery that must not be expected or intended—not the construction activity that causes that property damage.

\* \* \* \*

The [insurance] industry has now taken to arguing that whenever a claim of defective construction is alleged against an insured, the claim is automatically barred from coverage as not constituting an "occurrence." The position is nothing more than a rehash of the "business risk" doctrine, whose success depends entirely on courts ignoring the actual language of the CGL policy.

James Duffy O'Connor, *What Every Construction Lawyer Should Know about CGL Coverage for Defective Construction*, 21–WTR Constr. Law. 15, 17 (2001) (citation omitted).

We agree that faulty workmanship, standing alone, does not constitute an "accident" and cannot therefore be an "occurrence". In *Isle of Palms Pest Control Co. [v. Monticello Ins. Co.*, 319 S.C. 12, 459 S.E.2d 318 (Ct.App.1994)], this court construed identical policy definitions and found that faulty workmanship alone is not covered but faulty workmanship that causes an accident is covered. In that case, the court found that later termite damage to property caused by Isle of Palms' negligent failure to identify the presence of termites during its inspection was an "accident." The court noted "had there been preexisting termite damage, but no active termite infestation, the Purchaser's claim against Isle of Palms would have been one for faulty workmanship resulting in only economic losses."

*L–J, Inc. v. Bituminous Fire and Marine Insurance Co., supra* at 555–556, 567 S.E.2d at 492–493.

¶ 31 In the instant case, the damage at issue is not the absence of the grout or the size of the grout spaces but the deformation and deflection of the brick work, tie rods and roof of the battery which occurred after the battery was placed in use. Whether that damage was caused in whole or in part by the torrential rains of October 31st and November 1st, or by some other event during the heatup of the battery, we are not hesitant to conclude that the physical damage to the battery constituted an occurrence for which the policies provide coverage *UNLESS* otherwise precluded by one of the exclusions set forth in the policy.

¶ 32 The learned President Judge Cynthia C. Lazarus of the Ohio Court of Appeals, Tenth District, in addressing the precise issue presented by the conclusion of the trial court in the instant case, namely, that the damage to the Battery had not been caused by an "occurrence", cogently reasoned:

> An "occurrence" is defined as "an accident, including continuous or repeated exposure to the same general, harmful conditions."
>
> Unlike the trial court, we find that the Association's allegations of property damage caused by Colony's negligence in constructing and designing the condominium complex reasonably falls within the policy's definition of property damage caused by an "occurrence,"—*i.e.,* an accident. "In its common, ordinary use, the word 'accidental' means unexpected, as well as unintended." *Hybud Equip. ·Corp. v. Sphere Drake Ins. Co., Ltd.,* 64 Ohio St.3d 657, 666, 597 N.E.2d 1096 (1992). Here, the Association's complaint includes allegations that Colony's conduct, by itself or through agents, in constructing and designing the condominium complex was negligent—in other words, fell below the standard of care but nonetheless was not done with the intent or expectation of causing harm. As such, the Association's allegations reasonably fall within the policy's general liability coverage for property damage caused by an "occurrence."
>
> Erie cites numerous cases for the general proposition that a policy is not a performance bond and, hence, does not cover claims for insufficient or defective work or the repair and replacement of that work. *See, e.g. Zanco, [Inc. v. Michigan Mut. Ins. Co.] supra*[, 11 Ohio St.3d 114, 464 N.E.2d 513 (1984) ]; *State Automobile Mut. Ins. Co. v. Fairfield Homes, Inc.,* 1989 WL 139822, 1989 Ohio App. LEXIS 4351 (Nov. 14, 1989), Fairfield App. No. 11–CA–89, unreported; *Akers v. Beacon Ins. Co. of America,* 1987 WL 16260, 1987 Ohio App. LEXIS 8550 (Aug. 31, 1987), Marion App. No. 9–86–16, unreported. While this general proposition is true, the rationale for the proposition is not because the allegations of negligent construction or design practices do not fall within the broad coverage for property damage caused by an "occurrence," **but because, as discussed in the balance of this opinion, the damages resulting from such practices are usually excluded from coverage by the standard exclusions found in such policies.**

*Erie Insurance Exchange v. Colony Development Corp.,* 136 Ohio App.3d 406, 414, 736 N.E.2d 941, 947 (1999) (emphasis supplied).

¶ 33 Based on the aforementioned precedents from this jurisdiction and our sister states, we find that summary judgment was improperly entered against Kvaerner on the basis that there had been no "occur-

rence" as required by the terms of the policy.

¶ 34 While we find that the trial court erred in concluding, on cross-motions for summary judgment, that there had been no "occurrence", because this Court may affirm the order of the trial court for *any* reason, we must proceed to address the argument of National Union that even if there was an "occurrence", summary judgment was properly entered in its favor because the work "product-completed operations hazard" clause excluded coverage for damage to the battery itself.

¶ 35 We readily agree with National Union that the policies and the exclusions incorporated therein, **when read without** Endorsement 16, preclude coverage for any claims for injury to Kvaerner's work product, *i.e.* the battery. It is clear, however, that the endorsement at issue may provide coverage for some of the damages to the battery.

¶ 36 The work product exclusions contained in the policies (and in almost all other CGL policies issued in the United States) exclude coverage for "property damage to your product arising out of it or any part of it and included in the products-completed operations hazard." Since "your work" is defined to include work "performed by you or on your behalf," these provisions operate to exclude any coverage for damage to any part of the battery. Thus, if Endorsement 16 had not been added to the policy, we would affirm, without hesitation, the grant of summary judgment in favor of National Union, albeit on grounds different from those of the trial court.

"General liability insurance policies are intended to provide coverage where the insured's product or work causes personal injury or damage to the person or property of another." *Ryan Homes,*

*Inc. v. Home Indem. Co.,* 436 Pa.Super. 342, 647 A.2d 939, 942 (1994) (citations omitted); *see also:* 43 AmJur.2d Insurance § 14:13. "Provisions of a general liability policy provide coverage ... if the insured work or product *actively malfunctions,* causing injury to an individual or damage to another's property." *Ryan Homes,* 647 A.2d at 942 (citations omitted; emphasis added); *Redevelopment,* 454 Pa.Super. at 391, 685 A.2d at 589. These types of insurance policies involve risks that are limited in nature; they are not the equivalent of a performance bond on the part of the insurer. *Ryan Homes,* 647 A.2d at 942.

*Snyder Heating Co., Inc. v. Pennsylvania Manufacturers Association Insurance Co.,* 715 A.2d 483, 487 (Pa.Super.1998).

¶ 37 Certainly, however, Endorsement 16 alters the definition of "your work" under the "products-completed operations hazard" clause so as to exclude work performed by a subcontractor.

In 1986, the Insurance Services Office (ISO) issued reworded Commercial General Liability forms. The new form of the insured's work exclusion now states that the insurance does not apply to:

Property damage to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard'.

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

In light of these changes, in theory there should no longer be any doubt as to the limited scope of this exclusion. The court applied the 1986 exclusion in *National Union Fire Insurance Co. v. Structural Systems Technology, Inc.,* an action arising out of the collapse of a broadcasting tower which the insured

general contractor claimed was caused by defective prefabricated steel components supplied by a subcontractor. The court held that the exclusion did not apply because the insurer could not prove that the supplier of the steel components was anything other than a "subcontractor" within the meaning of the exclusion.

The 1986 revisions to the CGL policy significantly limit the effect of the work/product exclusions in construction defect cases. If the completed structure no longer qualifies as the insured contractor's "product", the exclusions would likely apply only to the extent that the contractor's own work was damaged as a result of its own faulty workmanship. *Comprehensive General Liability Policy Handbook,* p. 106 (Nelson, P., Ed.). *See, e.g. Massey v. Parker,* 733 So.2d 74 (La. App. 3rd Cir.1999). This exclusion was also examined in *L–J, Inc., supra.*

The exception to the 'your work' exclusion did not appear in CGL policies prior to 1986. The effect of this exception on a CGL policy is a novel question in this state. Bituminous argues this provision cannot "extend" coverage. Because the same CGL policies are found throughout the country, we look to other jurisdictions for guidance. The Wisconsin Court of Appeals in *Kalchthaler v. Keller Construction Company* [224 Wis.2d 387, 591 N.W.2d 169 (Wis.Ct.App.1999) ] concluded:

For whatever reason, the industry chose to add the new exception to the business risk exclusion in 1986. We may not ignore that language when interpreting case law decided before and after the addition. To do so would render the new language superfluous. We realize that under our holding a general contractor who contracts all the work to subcontractors, remaining on the job in a merely supervisory capacity, can insure complete coverage for faulty workmanship. However, it is not our holding that creates this result: it is the addition of the new language to the policy. We have not made the policy closer to a performance bond for general contractors, the insurance industry has.

*L–J, Inc. v. Bituminous Fire & Marine Ins. Co. supra,* 350 S.C. at 558–559, 567 S.E.2d at 494.

¶ 38 This history of the 1986 revision to the exclusion was reviewed by the California Fourth Appellate Division in a 1998 opinion:

In the 1973 version of the standard form CGL, the work performed exclusion precluded coverage for " 'property damage to work performed by or *on behalf of* the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith.' " (Croskey et al., Cal. Practice Guide: Insurance Litigation 2 (The Rutter Group 1997) P 7:1443, p. 7E–11, original italics omitted, italics added.) The "on behalf of" language was interpreted to mean no coverage whatsoever for damage to a subcontractor's work, or for damage to [the insured's] own work for damage resulting from a subcontractor's work." [*Maryland Casualty Co. v. Reeder,* (1990) 221 Cal.App.3d 961, 972, 270 Cal.Rptr. 719]. An insured under the 1973 CGL version could pay a higher premium and obtain a broad form property damage endorsement, which eliminated the "on behalf of" language and excluded coverage only for " 'property damage to work performed by the named insured ....' " (Croskey et al., Cal. Practice Guide: Insurance Litigation 2, *supra,* P 7:1452, p. 7E–14.) This extended coverage to the insured's " 'completed work when the

damage [arose] out of work performed by someone other than the named insured, such as a subcontractor.'" (*Maryland Casualty Co. v. Reeder, supra,* 221 Cal.App.3d at p. 972, 270 Cal.Rptr. 719.)

In *Maryland Casualty,* condominium owners sued the insured developer and builder when, several years after completion of the project, they experienced significant damage caused by soil subsidence and roofing failures. The building and developer were insured under a CGL policy with a broad form endorsement excluding coverage for "property damage to work performed by the named insured ...." The court found the endorsement, by omission, provided coverage for claims made against the insured arising out of work performed by the soils engineers, graders and roofing subcontractors. (221 Cal.App.3d at pp. 971–974, 270 Cal.Rptr. 719.)

The broad form endorsement was also interpreted in *Insurance Co. of North America v. National American Ins. Co.,* (1995) 37 Cal.App.4th 195 [43 Cal. Rptr.2d 518]. The insured, who had purchased a broad form endorsement with his CGL policy, was a roofing contractor on a condominium project. In the underlying action for damages attributable to roof failure, the roofing contractor was found liable to the developer under an indemnity agreement, but the jury apportioned the negligent cause among the roofing contractor and third parties. The court found the broad form endorsement excluded coverage "to the extent [the roofing contractor] damaged the roofs through its own negligence, but provid[ed] coverage to the extent [it] had liability for damage to the roofs caused by the negligence of third parties for whom [it] was derivatively liable." (*Id.* at p. 202, 43 Cal.Rptr.2d 518.)

In 1986, the standard CGL form was revised, and the exception to the work performed exclusion in ICW's policy was added. Thus, the work completed exclusion did not apply "'if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.'" (*Blackhawk Corp. v. Gotham Ins. Co.,* (1997) 54 Cal. App.4th 1090, 1096, [63 Cal.Rptr.2d 413].)

*Collett v. Insurance Co. of the West,* 64 Cal.App.4th 338, 341–342, 75 Cal.Rptr.2d 165, 167–168 (Cal.App.4th Dist.1998).

¶ 39 In reviewing a case bearing some similarities to the instant controversy, this Court, in *Unionamerica Insurance Co. Ltd. v. J.B. Johnson,* 806 A.2d 431 (Pa.Super.2002), found that coverage could not properly be denied by Unionamerica where, although the insured claimed that he had checked the weather forecast and covered and sealed the roof which he was then installing, the allegations of negligence contained in the complaint alleged that the damage had been caused, *inter alia,* by the insured's failure to determine whether adverse weather was approaching and failure to properly cover the roof. The policy at issue in *Unionamerica* specifically excluded coverage for damages due to property damage arising out of wind, hail, snow, rain, ice, or any combination of these, if:

(1) **The contractor has not taken prudent steps to determine any approaching adverse weather;**

(2) **The contractor has not provided a suitable temporary covering, able to withstand the normal elements.**

*Id.* at 433 (emphasis in original).

¶ 40 This Court, noting that an insurer has a duty to defend its insured "until it is clear that the claim has been narrowed to one beyond the terms of the policy," *Un-*

ionamerica Ins. Co. Ltd. v. J.B. Johnson, supra, 806 A.2d at 434, held that since Unionamerica bore the burden of proving the applicability of the exclusion, Unionamerica was required to defend Johnson until facts were proven at trial to demonstrate the applicability of the exclusion.

¶ 41 Similarly, this Court may not, in the absence of stipulated facts, resolve the questions of (1) what part, if any, of the work on the Battery was performed by subcontractors, (2) what portion, if any, of Kvaerner's work on the Battery was defective, or (3) what parts, if any, of the Battery that were in all respects properly constructed by Kvaerner were damaged by work improperly performed by Kvaerner or by a subcontractor? As a result, we are obliged to remand this case to the trial court for application of the provisions of Endorsement 16 to the facts as found by the trial court.

¶ 42 We, therefore, vacate the judgment entered in favor of appellee and remand for proceedings consistent with the foregoing.

¶ 43 BENDER, J., concurs in the result.