Filed 9/8/17

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| GLOBAL MODULAR, INC., Cross-defendant and Appellant, v. KADENA PACIFIC, INC. Cross-complainant and Appellant. | |
| NORTH AMERICAN CAPACITY INSURANCE COMPANY, Plaintiff and Appellant; v. KADENA PACIFIC, INC., Defendant and Appellant. | E063551 (Super.Ct.Nos. RIC1103551 RIC1304240) OPINION |

APPEAL from the Superior Court of Riverside County.  Daniel A. Ottolia, Judge.

Affirmed in part; reversed in part with directions.

Larson & Gaston, John B. Larson, and Gloria G. Medel for Cross-defendant and

Appellant.

1

K&L Gates, Timothy L. Pierce, and Kate G. Hummel for Defendant, Cross-complainant, and Appellant.

Grimm, Vranjes & Greer, Mark Vranjes, and Charles A. Phillips for Plaintiff and Appellant.

This case arises from an insurance dispute between a general contractor, its subcontractor, and the subcontractor's general liability carrier over water damage to a construction site caused by heavy rains. The United States Department of Veterans Affairs (VA) hired Kadena Pacific, Inc. (Kadena) as the general contractor to oversee construction of its Center for Blind Rehabilitation in Menlo Park. Kadena hired Global Modular, Inc. (Global) to build, deliver, and install the 53 modular units that would comprise the rehabilitation center. Because Kadena had hired a different subcontractor to install the roofing, Global agreed to deliver the units covered only by a roof deck substrate—a three-fourths of an inch base sheet of plywood.

Kadena had originally scheduled delivery of the units for the summer months, but delivery was delayed until October and November. This meant the roofless units were exposed to the elements during the rainy season, equipped with only a plywood substrate. Despite Global's efforts to protect the units by covering them with plastic tarps, the interiors suffered water damage from October through January. In February, Kadena and Global mutually agreed to terminate their contract and Kadena oversaw the remediation of the water-damaged interiors and completion of the project.

2

Global sued Kadena for failure to pay and Kadena countersued, alleging Global had breached the contract in various ways, including by failing to repair the water-damaged interiors. Before trial, the parties entered a partial settlement. Global paid Kadena $321,975 to release all of Kadena's claims arising from the VA project except for claims covered by Global's insurance policy with North American Capacity Insurance Company (NAC), and Global received $153,025 to dismiss its failure-to-pay claims. At trial, Kadena presented evidence on the scope and cost of its water remediation and argued Global was contractually responsible for the damage. The jury agreed and awarded Kadena slightly over $1 million.

In a separate suit brought by NAC, Kadena and NAC filed competing motions for summary judgment on the issue of whether NAC's policy required it to indemnify Global for the jury's damage award. The trial court ruled in favor of Kadena, finding the damage award covered under NAC's policy as a matter of law. The court also ruled that the award must be offset by the $321,975 Global paid in settlement and that Global was liable to Kadena for $360,000 in attorney fees.

On appeal, NAC contends the trial court erred in finding the water damages are covered under its policy; Kadena argues the court erred in offsetting those damages with Global's settlement payment; and Global and NAC argue the court erred in awarding attorney fees. We conclude the trial court properly determined NAC's policy covers the water damages and Kadena is entitled to attorney fees. However, we reverse the offset

3

order because Global's settlement payment did not compensate Kadena for the costs of its water remediation; the parties agreed to reserve that issue for litigation.

# I

# FACTUAL BACKGROUND

### A.    *Trial on the Water Remediation Damages*

Global and Kadena presented the following evidence at trial.  The VA's project specifications called for a modular design consisting of 53 units totaling over 37,000 square feet.  In October 2009, Kadena hired Global to build, deliver, install, and partially finish the modular units for the project, at a contract price of about $3.5 million.  Global's scope of work included the units' frame, ceiling, drywall, interior finishes, the HVAC and plumbing systems, and some aspects of the roof design, such as the plywood substrate, parapets, and hatches.  The scope of work excluded flooring and roofing.  Article XIII of the Kadena-Global contract stated Global assumed responsibility "for any loss or damage to the [units] . . . however caused, until final acceptance thereof by [Kadena]."  The contract conditioned "final acceptance" upon the VA's approval of the units.

Under the overarching construction schedule, Kadena was to pour the concrete foundations, then Global would deliver the units partially constructed, set them in place on the foundation, perform the additional construction required under the contract, then align and fasten the units together to form one main segment and two side wings.  After Global's work was complete, Kadena and other subcontractors would finalize the project,

4

which included installing the roofs and flooring, stuccoing the exterior of the units, and finishing the driveways and sidewalks. The VA had selected an EPDM roof, a rubberized sheet that adheres to the plywood substrate. According to Kadena, the roofing for all 53 units had to be installed at the same time (as opposed to piecemeal, as the units were delivered) in order to ensure the roof manufacturer's extended warranty.

Initially, the project schedule called for Global to deliver and finish the units during the summer months of 2010. But for various reasons, the schedule shifted significantly and Global did not deliver the units to the site until October and November. The parties spent a significant amount of trial time on the reasons for the delay in the delivery schedule. According to Kadena's witnesses, unexpected seismic and geological issues set the project back about 118 days and Global caused the rest of the delay by failing to timely build the units, submit designs, and install weld plates in the foundation.

Shortly after Global delivered the first shipment of units in early October, it rained and the interiors suffered water damage. Kadena's project manager emailed Global's operations manager and informed him that despite Global's use of plastic tarps, "the units experienced rain leakage and damage to the drywall and insulation." Over the next four months, the rains continued on and off and the units suffered additional water damage. Kadena's project manager sent several emails to Global's operations manager over this period, directing him to remediate the water damage and reminding him Global is responsible for the damage under their contract. Global's operations manager would respond to these emails by agreeing to address the issue. At trial, Global's operations

5

manager testified that although his crew had tried to protect the units by covering them with heavy-duty plastic tarps, the fact the units were equipped with only a roof substrate made them impossible to fully waterproof and weatherproof. He said it was unusual for a client to exclude roofing from the scope of work and that Global was used to installing the roofs in their factory, prior to delivery, "to make sure that the building is protected."

In early January 2012, Global hired ServiceMaster, a company specializing in disaster response, to assist with the water intrusion remediation. Around that same time, the roofing contractor began installing the EPDM roof. By mid-February, Global was still in the process of trying to remediate the interior water damage and had not yet completed its work on the units. At that point, the relationship between Kadena and Global had deteriorated and the parties decided to terminate their contract. Kadena then took on the task of remediating the water damage and completing the units. Kadena used its own crew in addition to the services of four other companies to remove and replace water-damaged drywall, insulation, wood framing, and ducting.

At trial, Kadena presented evidence on the scope and cost of this water remediation (the repair/replacement costs) and the number of days it delayed the project (the delay damages). Kadena argued Global bore the risk of loss for those damages under Article XIII of their contract because the units were not complete (that is, accepted by the VA) when they were damaged. Global argued Kadena was responsible for the water damage because, as the general contractor coordinating the project, it should have developed a plan to protect the units when it became evident rain was going to be an

6

issue—for example, by renting a place to store the units or having the roof installed piecemeal instead of all at once.

The jury agreed with Kadena and found Global contractually liable for a total of $1,068,541.91 in water intrusion damages, broken down as follows: $617,332.86 for drywall and insulation repairs; $113,020.05 for carpentry repairs; $46,125 for mechanical duct repairs; and $292,064 for delay.[1]

B.       *Summary Adjudication of Insurance Coverage*

NAC sought a declaration it was not obligated to indemnify Global for the water intrusion damages because they were not covered under its commercial general liability (CGL) policy. That policy covers "property damage" caused by an "occurrence," which is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." From this broad, occurrence-based coverage the policy carves out a variety of exclusions. Relevant to this appeal are exclusions j(5) and j(6) and exclusion m.

Kadena and NAC filed competing motions for summary judgment on the issue of coverage. NAC argued exclusions j(5) and j(6) apply to the costs of repairing and replacing the wet drywall, insulation, framing, and ducting. As to the delay damages, NAC argued they do not fall under the policy's insuring clause because they are not "property damage" and, even if they were, exclusion m applies to preclude coverage.

---

[1] In fact, the jury award totaled $1,168,931.08, but Kadena elected not to pursue two categories of damages—mold and concrete—because NAC's insurance policy has a $1 million limit.

7

Kadena argued exclusions j(5) and j(6) do not apply or are at the very least ambiguous, and thus should be interpreted in favor of coverage. It argued the delay damages fall under the insuring clause and exclusion m is inapplicable.

The trial court ruled both types of damages are covered under the policy and granted Kadena's motion for summary judgment. As to the repair/replacement costs, the court held exclusions j(5) and j(6) are ambiguous and can reasonably be interpreted to exclude damage to only the particular component of Global's work that was defective. Applying this interpretation to the undisputed facts from trial, the court found none of the drywall, insulation, framing, or ducting Kadena repaired or replaced was defective, and thus concluded exclusions j(5) and j(6) did not apply. As to delay damages, the court determined they were covered by the insuring clause and exclusion m did not preclude coverage because, like exclusions j(5) and j(6), it applied only to defective work.

C. *Offset and Attorney Fees*

Following the jury's verdict, Global filed a motion to offset the damage award by the amount of its settlement payment to Global and Kadena filed a motion for attorney fees. The court granted both motions. It ruled offset was appropriate because it saw no distinction between the claims Kadena had settled and the jury's damage award. It found Kadena was entitled to attorney fees under the Kadena-Global contract and rejected Global's assertion Kadena had released its right to obtain attorney fees under the settlement agreement.

8

## II

## DISCUSSION

A.      *The Summary Judgment Motions*

1.      *Standards of review*

"The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).)  Summary judgment is proper when there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law.  (Code Civ. Proc., § 437c, subd. (c).)  A plaintiff is entitled to summary judgment if it establishes there is no defense to the claim, and a defendant is entitled to summary judgment if it establishes a complete defense to the plaintiff's claim, or shows that one or more elements of the claim cannot be established.  (§ 437c, subd. (o); *Aguilar*, at p. 849.)  The moving party bears the burden of showing it is entitled to judgment as a matter of law.  (*Aguilar*, at p. 850.)

We review a grant of summary judgment de novo, and decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law.  (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.)  We are not bound by the trial court's stated reasons for granting summary judgment.  (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878.)

The interpretation of an insurance policy is a question of law we review de novo, applying the general principles of contract interpretation. (*Clarendon America Ins. Co. v. General Security Indemnity Co. of Arizona* (2011) 193 Cal.App.4th 1311, 1317 (*Clarendon*).) The goal of contract interpretation is to determine the mutual intent of the parties, "if possible, solely from the written provisions of the contract." (*Ibid.*) When the words of an insurance contract are unambiguous, we give them their plain and ordinary meaning. (*Ibid.* ["'If contractual language is clear and explicit, it governs'"].) "Courts will not strain to create an ambiguity where none exists." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18-19.) However, if the language is ambiguous, it "will generally be construed against the party who caused the uncertainty to exist." (*Clarendon*, at p. 1317.)

When it comes to interpreting a policy's exclusionary provisions, the burden is on the insurer "to phrase exceptions and exclusions in clear and unmistakable language." (*Harris v. Glens Falls Ins. Co.* (1972) 6 Cal.3d 699, 701.) It is a "fundamental principle that an insurer cannot escape its basic duty to insure by means of an exclusionary clause that is unclear." (*State Farm Mut. Auto. Ins. Co. v. Jacober* (1973) 10 Cal.3d 193, 201.) As a result, we resolve all "doubts, uncertainties and ambiguities" in exclusionary language in favor of the insured. (*Producers Dairy Delivery Co. v. Sentry Ins. Co.* (1986) 41 Cal.3d 903, 912.) This rule of interpretation applies even when another construction, one that would exclude coverage for the risk in question, is equally reasonable. (*Smith Kandal Real Estate v. Continental Casualty Co.* (1998) 67 Cal.App.4th 406, 415-416.)

10

With these principles in mind, we turn to the language of NAC's policy.

### 2. *The repair/replacement costs*

NAC does not dispute the repair/replacement costs fall under the policy's insuring clause because the wet interior components constitute property damage caused by an occurrence—rain. Instead, the dispute centers on whether the repair/replacement costs fall under exclusions j(5) and j(6).

Before turning to the provisions, we note this case presents an issue of first impression. Two California decisions, *Clarendon* and *Baroco West, Inc. v. Scottsdale Ins. Co.* (2003) 110 Cal.App.4th 96 (*Baroco*), which we discuss *post*, involve exclusions j(5) and j(6), however they do not interpret the language of the provisions relevant here. There are, however, some federal and out-of-state cases that do. Although these decisions are not binding on us, we consider them insofar as we find their reasoning persuasive. (See *Episcopal Church Cases* (2009) 45 Cal.4th 467, 490 [finding out-of-state decisions persuasive].)

### a. *Exclusion j(5)*

Exclusion j(5) excludes coverage for "[t]hat particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations." By its terms, the exclusion applies only if the damage arises out of Global's operations and applies only to damage to the particular part of real property on which Global was performing operations at the time of damage.

11

The parties' dispute concerns the meaning of the phrase "are performing operations." NAC argues the phrase refers to *works in progress* and therefore exclusion j(5) applies when the property damage occurs before construction is complete. Kadena argues the phrase is more narrow, referring only to the *particular component* Global was *physically working on* at the time of the property damage. Under that interpretation, the exclusion does not apply to the water intrusion damages because the intrusion occurred during heavy rains when Global was not working on the units.

We conclude the use of the active, present tense construction "are performing operations" indicates the exclusion applies only to damage caused during physical construction activities. Had the policy drafters intended the exclusion to apply more broadly to damage to any of the insured's work in progress, we would expect the provision to say something along the lines of, "property damage to that particular part of real property on which your operations are not yet complete" or even "property damage to your work arising out of your operations." The drafters use this kind of broad language elsewhere in the policy, such as in exclusion l, which excludes "'[p]roperty damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.'" This provision precludes coverage for damage to any of the insured's work once it has been completed or abandoned. We find it telling exclusion j(5) employs a much more narrow construction, restricting the excluded damage to only that *particular* part *on which* the insureds *are performing* operations.

12

Other courts that have interpreted this exclusion agree. In *Mid-Continent Cas. Co. v. JHP Dev., Inc.* (5th Cir. 2009) 557 F.3d 207 (*Mid-Continent*), the Fifth Circuit held exclusion j(5) did not apply to damage that occurred during a suspension of construction activities before the contract work was complete. The court explained, "the use of the present tense 'are performing operations' in exclusion j(5) makes clear that the exclusion" applies "only to property damage caused during *active physical construction activities*." (*Id.* at pp. 213, 218, italics added.)

In *Columbia Mut. Ins. Co. v. Schauf* (Mo. 1998) 967 S.W.2d 74 (*Schauf*), the Supreme Court of Missouri interpreted an identical exclusion to require physical construction operations at the time of damage. In that case, a contractor hired to paint cabinets accidentally started a fire in his client's kitchen while cleaning his paint sprayer at the end of the day. At issue was whether he was "performing operations" when he started the fire. He argued he was not because his contract defined his scope of work as "painting" the cabinets and he was not *in the middle of painting* when he started the fire. (*Id.* at p. 79.) The court disagreed, stating "[i]t would not be reasonable to conclude, for example, that an insured is performing operations on real property when touching a paint brush to the wall, but is not performing operations on real property when dipping that brush into the can of paint. Although [the contractor] was not directly producing an effect on real property when he started the fire, he was, nevertheless, performing operations on the [client's] house." (*Ibid.*)

13

In rejecting such a narrow definition of "performing operations" that would distinguish among types of operations, the Missouri Supreme Court nevertheless adopted a definition that required "doing or performing . . . practical work." (*Schauf*, *supra*, 967 S.W.2d at p. 78.) The court explained: "In order for the instant exclusion to apply, [the contractor] must have been *performing operations on real property* within the meaning of this provision. *Perform* means 'to carry out or bring about: ACCOMPLISH, EXECUTE.' Webster's Third New International Dictionary 1678 (1966). *Operation* is defined as 'a doing or performing of a practical work. . . .' *Id.* at 1581. In this context, *on* is 'used as a function word to indicate the object of action or motion.' *Id.* at 1575." (*Ibid.*) The court concluded, the exclusion bars coverage for damage to the property on which the insured "'*is performing operations*,' not on which the insured *did perform operations*, *will perform operations*, or *has contracted to perform operations*." (*Id.* at p. 81.)

Like the Missouri Supreme Court, we view the most reasonable interpretation the one that applies a word's ordinary definition and gives meaning to every word in the provision. NAC's interpretation would broadly apply to any period before an insured's work on a project is complete—whether or not the damage occurred while the insured was physically present and working on the project at the time of damage. In our view, that interpretation overlooks the present tense of the phrase "are performing operations" and the active aspect of "perform" and "operate." But, even if we were inclined to find NAC's interpretation reasonable, we would be required to resolve the ambiguity in favor

14

of coverage. (E.g., *Western Employers Ins. Co. v. Arciero & Sons, Inc.* (1983) 146 Cal.App.3d 1027, 1030 ["It is well-known that any ambiguities in an insurance policy will be construed against the insurer"]; *Producers Dairy Delivery Co. v. Sentry Ins. Co.*, *supra*, 41 Cal.3d at p. 912 [any doubts as to the application of insurance exclusions are resolved in favor of coverage].)

NAC argues Kadena's interpretation is irrelevant because Kadena is not a party to the policy and, as a result, it is improper to construe policy ambiguities in Kadena's favor. NAC asserts the proper inquiry is what Global, the insured, understood the policy to mean and points out that Global argues on appeal the jury's damage award is not covered under the policy. Contrary to NAC's contention, our interpretation is not based on Kadena's understanding of the contract. Instead, we base our interpretation on the objectively reasonable meaning of the policy's plain language—in other words, what Global should have understood the policy to mean *at the time of contracting*. (See, e.g., *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1265 [applying a policy's "objectively reasonable" meaning protects the insured's reasonable expectations over the "subjective beliefs of the insurer"].) Global's position on appeal is irrelevant to that inquiry. We therefore affirm the court's determination that exclusion j(5) does not apply to the repair/replacement costs.

15

b. *Exclusion j(6)*

Exclusion j(6) applies to "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." The parties disagree over the meaning of "that particular part" and "work . . . incorrectly performed."

NAC argues the exclusion applies to the repair/replacement costs as they are a result of Global's inadequate efforts to waterproof the units. In other words, Global's *waterproofing* is the incorrectly performed work and *the units* are the particular part that must be repaired because of that work. Kadena contends this interpretation is too broad. To begin with, Kadena disagrees Global's waterproofing efforts were incorrectly performed and instead argues the severe weather simply overcame the plastic tarps and plywood substrate. Even assuming Global's waterproofing efforts were subpar, Kadena argues they do not constitute *incorrect work* as the phrase is used in exclusion j(6). Kadena contends the phrase refers to a *product*, such as warped or uneven floors, not a *process* like covering the units with plastic tarps. Finally, assuming Global's waterproofing efforts are incorrect work, the "particular part" Global performed the incorrect work "on" was the plywood substrate, not the interior parts of the units for which Kadena sought repair/replacement costs. Those parts—the drywall, insulation, framing, and ducting—were not defective and were not the subject of Global's incorrect work, and as a result, their repair and replacement costs do not fall under exclusion j(6). We agree with Kadena that the exclusion applies narrowly.

16

Merriam-Webster defines "particular" as "of, relating to, or being a single person or thing," "distinctive among other examples or cases of the same general category," and "one unit or element among others." (Webster's 9th New Collegiate Dict. (1991) p. 858.) The same source defines "part" as "one of the often indefinite or unequal subdivisions into which something is or is regarded as divided and which together constitute the whole." (*Id.* at p. 857.) These definitions indicate the phrase is intended to be a narrowing element, one that limits the provision's application to a distinct part of a construction project. That the incorrect work must have been performed "on" that particular part is an additional narrowing element. Had the policy drafters not intended the exclusion to apply narrowly, they easily could have left out the prepositional phrase and written the exclusion to apply to "that particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed." Were this how the exclusion read, NAC's interpretation would be objectively reasonable. As written, however, the exclusion's narrowing language demonstrates it refers to the *specific part of the insured's work* on which the insured performed faulty workmanship and not, more broadly, to the *general area of the construction site* affected by the insured's work.

Courts of other states have also adopted this interpretation. In *Schauf*, the Missouri Supreme Court explained, "[h]ouses and buildings can be divided into so many parts that attempting to determine which part or parts are the subject of the insured's operations can produce several reasonable conclusions." (*Schauf*, *supra*, 967 S.W.2d at

17

p. 80.)  Finding the exclusion ambiguous and therefore interpreting it narrowly, the court concluded, "[t]he exclusion applies to the 'property *on* which [the insured] is performing operations,' not to the area *in* which the insured is performing operations."  (*Id.* at p. 81.)

In *Mid-Continent*, the Fifth Circuit applied the narrower interpretation of exclusion j(6), explaining:  "The narrowing 'that particular part' language is used to distinguish the damaged property that was itself the subject of the defective work from other damaged property that was *either the subject of nondefective work by the insured* or that was not worked on by the insured at all."  (*Mid-Continent*, *supra*, 557 F.3d at p. 215, italics added.)  The Sixth Circuit has also applied the narrower interpretation, stating:  "The opening words of the exclusion—namely, '[t]hat particular part'—are *trebly restrictive*, straining to the point of awkwardness to make clear that the exclusion applies only to building parts on which defective work was performed, and not to the building generally."  (*Fortney & Weygandt, Inc. v. Am. Mfrs. Mut. Ins. Co.* (6th Cir. 2010) 595 F.3d 308, 311, italics added.)

While no *California* case has interpreted the phrase "that particular part" as it appears in exclusion j(6), the cases interpreting the phrase in other CGL policy provisions reject the idea that it extends to the insured's project as a whole or to the entire area affected by the insured's defective work.  In *Eichler Homes, Inc. v. Underwriters at Lloyd's, London* (1965) 238 Cal.App.2d 532 (*Eichler*) and *Blackfield v. Underwriters at Lloyd's, London* (1966) 245 Cal.App.2d 271 (*Blackfield*) the policies excluded "damage to that particular part of any property upon which the [insured] is or has been working

18

caused by the faulty manner in which the work has been performed." (*Eichler*, at p. 534; *Blackfield*, at p. 273.) In both cases, the insured had built an entire house and an identifiable portion of the house turned out to be defective, causing damage to other portions of the house. (*Eichler*, at p. 535 [defective heating system]; *Blackfield*, at p. 272 [defective foundation].) In both cases, the insurance company argued the exclusionary provision applied to the entire house as the entire house was the subject of the insured's work under the construction contract. (*Eichler*, at p. 538; *Blackfield*, at pp. 275-276.) The *Eichler* and *Blackfield* courts rejected this argument and held the exclusion applied only to the particular component of the house that had been defective. (*Eichler*, at p. 538; *Blackfield*, at pp. 275-276.)

Based on the above, we conclude exclusion j(6) applies only to the particular *component* of the insured's work that was incorrectly performed and not to the insured's entire project. Here, based on the undisputed facts from trial, the only arguably defective components or parts of Global's work are the plastic tarps, as they failed to keep the water out. However, because the jury was not asked to decide whether Global's waterproofing efforts were incorrect or simply overcome by heavy rains, it is by no means an undisputed fact the tarps were faulty or Global's placement of them incorrect.[2]

---

[2] The issue for the jury was limited to whether Global contractually bore the risk of loss to the units at the time they were damaged. At trial, Kadena introduced multiple emails in which its project manager accuses Global of not doing enough to protect the units from the rain, but the purpose of these emails was not to prove Global's waterproofing efforts were "incorrect" but rather to show Global had accepted responsibility for the damage.

19

But more importantly, there was no allegation *the items for which Kadena sought repair and replacement costs*—the drywall, insulation, framing, and ducting—*were defective*. Those items were acceptable until it rained and they suffered water damage. We therefore conclude the trial court was correct in determining exclusion j(6) does not preclude coverage for the repair/replacement costs as a matter of law.

   c.  *NAC's contentions*

NAC argues exclusions j(5) and j(6) unambiguously apply to the repair/replacement costs because the exclusions cover "faulty workmanship" and Global provided faulty work by failing to protect the units from the rain. NAC asserts CGL policies are intended to cover only the risk of damage to *third-party property* and are not meant to insure contractors against the "business risks" occasioned by their own faulty workmanship. According to NAC, a determination that exclusions j(5) and j(6) do not apply to the repair/replacement costs will "turn the insurance industry on its head." We disagree.

NAC is correct that CGL policies "are not designed to provide contractors and developers with coverage against claims their work is inferior or defective." (*Maryland Casualty Co. v. Reeder* (1990) 221 Cal.App.3d 961, 967.) "The risk of replacing and repairing defective materials or poor workmanship has generally been considered a commercial risk which is not passed on to the liability insurer . . . As one commentator explained: 'This distinction is significant. Replacement and repair costs are to some degree within the control of the insured. They can be minimized by careful purchasing,

20

inspection of material, quality control and hiring policies. If replacement and repair costs were covered, the incentive to exercise care or to make repairs at the least possible cost would be lessened since the insurance company would be footing the bill for all scrap.'" (*Ibid.*) However, this is not a garden variety case of an insured seeking coverage for the costs of repairing its defective materials or poor workmanship. Here, Kadena contracted for units equipped with substrate only. Such a product is not designed to withstand heavy rains. Global's finished product was in actuality an unfinished product awaiting a roof, the very thing that would have prevented the property damage. This is simply not a case where an insurance company is being asked to foot the bill for the insured's decision to use cheap or defective materials.

The problem with NAC's argument is that it is based on its view of the underlying policy of commercial general liability insurance and not on an application of the policy language to the facts of the case. The actual text of the CGL policy does not support NAC's argument. For starters, the insuring clause makes no distinction between insured and third-party property. It provides NAC "will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage,'" and property damage is defined as "[p]hysical injury to tangible property" with no reference to ownership. Similarly, nothing in the text of exclusions j(5) and j(6) indicates they are meant to apply broadly to any damage to the insured's work before completion. As discussed above, had the policy drafters intended exclusions j(5) and j(6) to exclude damage to all of the insured's work before completion, they either would have drafted

21

those provisions as broadly as exclusion l or would not have limited exclusion l to completed operations.

Other jurisdictions have rejected similar invitations to ignore policy language in favor of a general principle against insuring against "business risks." In *Lamar Homes, Inc. v. Mid-Continent Cas. Co.* (Tex. 2007) 242 S.W.3d 1, the insurance company argued the policy did not cover "damage to the insured's own work" because the underlying purpose of a CGL policy is to bear the risk of damage to third-party property. (*Id.* at p. 12.) The Supreme Court of Texas held the CGL policy at issue made no such distinction: "The CGL's insuring agreement simply asks whether 'property damage' has been caused by an 'occurrence.' Therefore, any preconceived notion that a CGL policy is only for tort liability [for damage to third-party property] must yield to the policy's actual language." (*Id.* at p. 13.) The court stated that coverage for so-called "business risks" of an insured's faulty workmanship "depends, as it always has, on the policy's language," which, the court noted, contained an insuring clause that was "quite broad." (*Id.* at p. 14.)

The Supreme Court of Minnesota echoed this conclusion in *Thommes v. Milwaukee Ins. Co*. (Minn. 2002) 641 N.W.2d 877, where it held exclusions j(5) and j(6) were ambiguous and thus did not preclude coverage. (*Id.* at p. 884.) The court warned against affording the "business risk" doctrine more weight than the text of policy exclusions. The "first step" in determining coverage "is to examine the policy language." (*Id.* at p. 882.) The business risk principle can be useful "as a means of illuminating the underlying purpose of CGL insurance," but it should never "serve as the foundation for a

22

separate 'business risk doctrine' that operates to override the express language of policy exclusions." (*Id.* at p. 880.)

NAC contends case law supports its argument that exclusions j(5) and j(6) preclude coverage for damage to an insured's work while construction is ongoing. NAC principally relies on *Clarendon*, *Baroco*, and *Bituminous Cas. v. Northern Ins. Co.* (2001) 249 Ga.App. 532 (*Bituminous*). In *Clarendon*, a couple sued the contractor they had hired to build their home, alleging various construction defects on the contractor's part had caused damage to the building's interior and exterior. (*Clarendon*, *supra*, 193 Cal.App.4th at p. 1315.) The focus of the opinion was whether the "products-completed operations hazard" clause applied, but, as an alternate ground for finding no coverage, the court concluded exclusion j(6) applied to the couple's claims of "'defects and deficiencies'" in the contractor's work. (*Id.* at pp. 1316, 1326.)

In *Baroco*, this court held the insurer had no duty to defend the insured against allegations its work was defective because exclusions j(5) and j(6) applied to preclude coverage. (*Baroco*, *supra*, 110 Cal.App.4th at p. 105.) The complaint apparently contained various allegations of defective work, but the only allegation referenced in the opinion is that the driveway was "cracked and slipping." (*Id.* at pp. 99, 104.)

In *Bituminous*, the contractor installed a defective deck and agreed to replace it. (*Bituminous*, *supra*, 249 Ga.App. at p. 532.) Over a weekend during the replacement construction, a predicted storm blew off the plastic sheets covering the contractor's unfinished work, and interior portions of the house were inundated with water. (*Ibid.*)

23

The court held exclusions j(5) and j(6) applied to preclude coverage for the water damage because it was "caused by the defective workmanship of the insured." (*Id.* at p. 534.)

These cases are factually distinguishable because they involve the cost of replacing an insured's defective—as opposed to non-defective—work. *Bituminous* seems the most analogous as it involves rain and plastic tarps, but the comparison is superficial. The contractor in *Bituminous* had acknowledged its product, the deck, was defective and the water intrusion occurred as it was replacing that product. Thus, the property damage in *Bituminous* can truly be said to have occurred *because* the contractor's work was *incorrectly performed*. Here, on the other hand, we do not know whether Global's rain protection was defective or simply overcome by heavy rain.

More importantly, none of these decisions interpret the exclusionary language at issue here—"are performing operations," "that particular part," and "work . . . incorrectly performed." And, given the case law supporting our interpretation of those phrases, even if NAC's decisions did support its interpretation (and we do not think they do), the exclusions would be, at best, ambiguous.

We affirm the trial court's determination that NAC's policy covers the repair/replacement costs as a matter of law.

### 3.	*Delay damages*

NAC argues the trial court erred in concluding the policy covers the delay damages the jury awarded for the 131 days Kadena spent remediating the water damage to the unit interiors. NAC contends damages for delay are not covered by the CGL's

24

insuring clause because they do not constitute "property damage." Even if delay were covered, NAC argues, exclusion m applies to Kadena's delay damages because the underlying repair/replacement costs are excluded under j(5) and j(6).[3] We disagree on both points.

First, we reject NAC's argument that exclusion m applies to the delay damages because, as just discussed in the previous section, exclusions j(5) and j(6) *do not* apply to the underlying repair/replacement costs. Second, contrary to NAC's contention, delay damages arising from "property damage" fall under the insuring clause, which obligates NAC to "pay those sums that the insured becomes legally obligated to pay as *damages because of* . . . 'property damage' to which this insurance applies." (Italics added.) The policy does not define damages, but courts generally interpret the term to mean payments made to compensate a party for direct and consequential injuries caused by the acts of another. (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 826 (*AIU*); *Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 385, 396-397 ["damages" in an insuring clause covers court-awarded "direct and consequential damages"].)

Here, the 131 days of remediation was time Kadena could have spent completing the project had the units' interiors not been damaged. That delay constitutes a consequential loss (a loss occasioned by the water intrusion) and as such, is part of the

---

[3] Exclusion m applies to property damage to "impaired property" or "property that has not been physically injured," arising out of "[a] defect, deficiency, inadequacy or dangerous condition" in the insured's "product" or "work," or arising out of the insured's "delay or failure . . . to perform a contract or agreement in accordance with its terms."

damages NAC must pay "because of" property damage. (Cf. *AIU*, *supra*, 51 Cal.3d at pp. 829-830 [interpreting "damages" in CGL insuring clause broadly to include all of the government's "expenses" attributable to "actual cleanup, mitigation of damage, or investigation and monitoring"].) We therefore affirm the trial court's determination that Kadena's delay damages are covered under the policy.

B.     *Motion for Attorney Fees*

Global and NAC argue we must reverse the fee award because Kadena released its right to obtain attorney fees under its settlement agreement with Global.[4] We conclude Kadena did not release attorney fees related to its water damage claim and the court's ruling was correct.

California Code of Civil Procedure sections 1033 and 1033.5 allow a party to "claim[]" attorney fees as costs if allowed under law or statute. Article XXXV of the Kadena-Global contract states that Global "expressly agrees" to pay the reasonable attorney fees Kadena incurs in "enforcing any provision or obligation arising under" the contract. California Civil Code section 1717 provides: "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, . . . the party who is determined to be the party prevailing on the contract . . . shall be entitled to reasonable attorney's fees in addition to other costs."

---

[4] Kadena sought attorney fees directly from Global and the trial court entered the award against Global, not NAC. NAC has standing to challenge the judgment, however, because its policy obligates it to pay attorney fees taxed against Global in any suit NAC defends, and NAC has represented it provided Global defense at trial.

26

When Kadena and Global negotiated their settlement, multiple claims involving the VA project were pending. Global had sued Kadena for failure to pay for its work on the modular units and Kadena had sued Global, alleging three breaches of contract: failure to provide materials on time, failure to provide materials in a workmanlike manner, and failure to repair the water damage to the units. The settlement agreement was intended to resolve all of the parties' disputes except for claims Global's insurance would cover. To accomplish this, the agreement contained two main provisions, one releasing "all claims" arising from the VA project and another carving out a limited subset of claims arising from the VA project that the parties were reserving for litigation. The carve-out provision states in full:

"4.1.1 Notwithstanding the language of Civil Code section 1542 and the waiver provided in Section 4.2 of this AGREEMENT, it is the PARTIES' express intent and they so agree that this AGREEMENT *does not release claims from the Project related to* property damage, personal injury, [loss] of use and other claims that are covered under the [NAC] insurance policies described in Section 4.9.1 of this AGREEMENT, true and accurate copies of which are attached to this AGREEMENT as Exhibits 'A' and 'B.'" (Italics added.)

Based on the above, we conclude the settlement agreement allows Kadena to pursue its water damage claim and, in turn, the Kadena-Global contract, Civil Code section 1717, and Code of Civil Procedure sections 1033 and 1033.5 allow Kadena, as the prevailing party, to seek attorney fees as part of that claim. In asserting Kadena

27

released its right to claim attorney fees under the settlement agreement, Global and NAC rely on an incomplete excerpt of the settlement's carve-out provision. They argue the provision carved out *only* "property damage [claims] . . . that are covered by [NAC insurance] policies" and that a claim for attorney fees is not technically a claim for "property damage."

First, as the full text of the carve-out provision demonstrates, it applies not just to covered property damage claims but to claims "related to" covered property damage claims. Global and NAC simply ignore the relevant language in the provision. Second, even if it did not contain the phrase "related to," we would conclude the carve-out provision encompasses a claim for attorney fees because such a claim attaches to a successful claim as a matter of right under Kadena and Global's contract and California statutory law. Either way one interprets the carve-out provision—that attorney fees are *part of* the property damage claim or that a claim for attorney fees is *related to* the property damage claim—Kadena did not release its right to obtain attorney fees under the settlement agreement.

Global and NAC argue the carve-out provision applies only to claims that are covered by NAC's policy and, while the policy obligates NAC to pay all attorney fees taxed against the insured in any suit NAC defends on the insured's behalf, that obligation is part of NAC's *defense* obligation, not its *indemnification* obligation. Put another way, they contend attorney fees are not "claims," but instead "costs taxed against the insured" in a lawsuit over a covered claim. How attorney fees are defined under NAC's policy

28

may become relevant if Global seeks indemnification for the fees *from NAC*, but it is irrelevant to Kadena's ability to obtain such fees *from Global*. For that determination, we look to the provisions of the Kadena-Global contract, California statutory law, and the settlement agreement. Under those authorities, Kadena's claim against Global for attorney fees is a claim covered by the carve-out provision.

C. *Motion for Offset*

Kadena contends the court erred when it granted Global's motion to offset the jury's damage award by $321,975—the amount Global paid Kadena under the settlement agreement. Global defends the trial court's ruling by arguing Kadena pursued at trial every conceivable claim it had "from the beginning of the project to the end of Global's involvement and beyond." Kadena argues the record clearly establishes it litigated only its water damage claims because it had released its other claims under the settlement agreement in exchange for a payment of $321,975. We agree with Kadena that Global is not entitled to an offset.

1. *Additional background*

After the parties terminated their contract, Global filed a suit in state court alleging Kadena breached the contract by failing to pay Global for its work, as well as a collection action under the Miller Act in federal court. Kadena filed a cross-complaint in the breach of contract action alleging Global failed to: (1) "provide the services and materials required under the [contract] in a timely manner"; (2) "provide modular buildings which were constructed in a good and workmanlike manner according to industry standards and

29

applicable government and building codes"; and (3) "deliver the required modular buildings in a manner in which they were protected from the elements." Kadena alleged it suffered at least $5 million in damages as a result of these breaches.

In August 2012, while these suits were pending, Global and Kadena executed their settlement agreement. As explained, they agreed to release all claims arising out of the VA project *except* claims from the project "related to" claims covered by NAC's policy (the "insured claims"). Before the parties began working together on the project, Global had placed $500,000 in an escrow account to be released to Global on completion of the project or to be released to Kadena if Global breached the contract. In exchange for Kadena's promise to release all claims against Global that are not covered by NAC's policy (the "uninsured claims"), Global agreed to pay Kadena $321,975 from the escrow account. As consideration for Global's promise to release the failure-to-pay suits, Global kept $153,025 of the escrow funds. Global agreed to dismiss its state and federal suits, but the parties agreed Kadena "need not dismiss its cross-complaint," instead, it would "continue to pursue only those claims not released [in the settlement]."

The parties proceeded to trial on Kadena's now-limited cross-complaint and the court gave the jury the following instruction at the outset:

"The project started in early 2010. Global built the units at its factory in Chowchilla and then transported them to the project site in Menlo Park. The units were delivered partially constructed. Upon delivery, they were to be set onto poured concrete foundations. Thereafter, Global was to finish the installation by completing interior

30

work, installing doors and windows, and utilities. Kadena was to install the final roof membrane.

"Global delivered the first modular units in October of 2010. Shortly after the first units were delivered, the project experienced rain, which continued throughout the winter. Although Global took measures to protect the modular units from the rain, they experienced water damage. Kadena contends that Global is responsible *for the water damage*. Global denies responsibility and contends that Kadena could have taken action to prevent the water damage.

"Kadena also claims that it was delayed in its ability to complete the project. Kadena claims that its damages *from water damage and from delays* exceed $1 million." (Italics added.)

During trial, Kadena limited its evidence of damages to how much it cost to have its own crew and four other companies remediate the water-damaged drywall, insulation, framing, and ducting, and to how much it suffered in delay damages during that remediation. Kadena's owner, Scott Bailey, testified the company experienced 131 "days of delay that was specific to the rain [remediation]." To calculate the costs of this delay, Bailey multiplied Kadena's average overhead costs for one day of project supervision by the 131 days Kadena spent on remediation. He studied Kadena's financial records and determined its average daily overhead cost for the VA project was $2,239, which, multiplied by 131, equaled about $293,000.

31

Before closing argument, Kadena's counsel asked the court to provide a limiting instruction directing the jury to focus on only the issue of water damages because the parties had already resolved any other issues under their contract. Kadena's counsel was concerned the jury would consider the evidence it had heard about Kadena not being able to pay Global because the VA had withheld those amounts. Global's counsel opposed the instruction; he wanted to argue during closing that Kadena had suffered no damages because it had completed the modular units for less than the Global-Kadena contract price. The following exchange occurred:

Kadena's Counsel: "[W]e have a settlement agreement that resolved everything about payment under the contract, and the only thing left in the case is what's—our pursuit of the property damage claim . . . So I think we need to give them an instruction that says the only thing we are asking you to focus on is the valuation of the property damage. There may be other issues about the contract that you haven't heard about, and that's because they've already been resolved, and you need not worry about them."

"The Court: All right. I would read a limiting instruction to that effect."

Global's Counsel: "I intended, past tense, to introduce the fact that the complete job was completed by Kadena for less money than what they would have had to pay my client; hence, no damages."

Kadena's Counsel: "That's not true. We don't have all the—we only have the water damage costs. We don't have the cost of finishing their work."

32

Global's Counsel: "That's the whole kit and caboodle. That's what your client testified to."

Kadena's Counsel: "No, he did not."

"The Court: I don't think there was any evidence of the total cost. I did not hear any evidence of the total cost."

Global's Counsel: "If that's the Court's ruling."

"The Court: That is the Court's ruling."

At the close of evidence, the court instructed the jury that Kadena's claim for breach of contract was based on Global's alleged obligation, and failure, to "repair the water damage" to the unit interiors. It also provided the limiting instruction Kadena's counsel had requested:

"As you may have determined, this case *focuses on the water damage* for which Global is responsible, if at all, and the value of any such damages to Kadena to address the water damage. There are *other issues* related to the contract that have *already been resolved*, and you need not worry about those issues or any issues outside the issue of property damage, if any, for which Global is responsible." (Italics added.)

The special verdict form listed eight categories of damages: (1) Concrete Repair; (2) In-house Drywall Repair; (3) Rough Carpentry; (4) WF Hayward Drywall Repair; (5) KR Environmental Services; (6) ServiceMaster Restoration; (7) Golden Valley Mechanical Duct Repair; and (8) Damages Due to Delay. The jury found Global was

33

responsible for repairing the water damage under the contract and assigned amounts to each of the damage items.

After trial, Global brought a motion for offset, asking the court to subtract $321,975—the amount it paid Kadena under the settlement—from the jury's damage award. Kadena opposed the motion, arguing the settlement payment compensated it for different harms than the damage award. Kadena acknowledged its cross-complaint had alleged Global breached the contract in multiple ways, causing over $5 million in damages, but pointed out the parties subsequently settled all of those allegations except the allegation that Global was responsible for repairing the water damage. The trial court granted the motion for offset, finding trial had not been limited to insured claims and concluding the insured and noninsured claims are too intertwined to separate.

### 2. *Analysis*

The equitable concept of offset recognizes it is unfair to require a defendant to compensate a plaintiff twice for the same injury. "To prevent a double recovery, equity demands credit be given for payments received on the judgment." (*Jhaveri v. Teitelbaum* (2009) 176 Cal.App.4th 740, 753 (*Jhaveri*).) "The plaintiff is entitled only to a single recovery of full compensatory damages for a single injury." (*Howard v. American Nat. Fire Ins. Co.* (2010) 187 Cal.App.4th 498, 516.)

"The right of offset rests upon the inherent power of the court to do justice to parties appearing before it" and we review a trial court's ruling on a motion for offset for abuse of discretion. (*Jhaveri*, *supra*, 176 Cal.App.4th at p. 753.) A trial court abuses its

34

discretion if it misinterprets the law or makes a factual finding not supported by substantial evidence. (*Ibid.* [upholding court's offset ruling because "substantial evidence supports the . . . finding that appellants are entitled to a $61,000 credit against the judgment"]; *Board of Administration v. Wilson* (1997) 57 Cal.App.4th 967, 973 ["The question is whether the trial court's actions are consistent with the substantive law and, if so, whether the application of law to the facts of the case is within the range of discretion conferred upon the trial court"].)

Thus, to warrant offset, Global's settlement payment to Kadena must have compensated Kadena *for the same harm* as the jury's damage award. The record demonstrates this was not the case. Kadena had originally sued Global alleging various contractual breaches and seeking over $5 million in damages. Before trial, however, the parties settled several claims—Global its failure-to-pay claim and Kadena all of its uninsured claims. At trial, Kadena upheld its end of the settlement agreement by pursuing only its allegation that Global breached the contract by failing to repair the units' water-damaged drywall, insulation, framing, and ducting. That the trial was so limited is evidenced by the court's opening instructions describing the nature of the suit, the limited scope of Kadena's evidence on its damages, the court's closing instructions (most notably the limiting instruction), and the jury's special verdict, which shows the jury awarded *specific categories* of damages relating only to the water remediation and not, say, to defective workmanship or pre-rain delays. Indeed, the trial court recognized the limited nature of the jury's damage award in its written ruling on the cross-motions

35

for summary judgment when it stated the delay damage component "compensates for delays that *relate only to the covered property damages* [i.e., water damage] and is not an item of general delay damages." (Italics added.)

Based on this record, the trial court's conclusion that trial was not limited to insured claims is not supported by substantial evidence. The court's ruling overlooks the fact Kadena settled its faulty workmanship and pre-rain delay claims after filing its cross-complaint and limited the evidence of its damages to the costs of remediating the water damage to the unit interiors. The record demonstrates Global's settlement payment compensated Kadena for releasing those faulty workmanship and pre-rain delay (i.e., uninsured) claims, and did not compensate for the water damage remediation costs. As a result, the settlement payment does not constitute a payment "received on" the judgment. (*Jhaveri*, *supra*, 176 Cal.App.4th at p. 753.)

In arguing otherwise, Global claims nothing in the settlement agreement delineates between insured and uninsured claims. It also contends Kadena presented evidence of uninsured claims at trial. These arguments strike us as disingenuous considering Global's representations to the trial court about the import of the settlement agreement. Before trial, Global served Kadena with notice of its motion in limine to exclude "any evidence of damages claimed by [Kadena], which are not covered under [Global's] policies of insurance." Global made the following argument in its motion: "[P]ivotal in this case is the underlying settlement entered . . . in which KADENA agreed to release **any and all claims** as against GLOBAL **except** 'property damage, personal injury, loss

36

of use and other claims' covered by GLOBAL's Commercial General Liability Policies issued by [NAC]. . . . In short, if KADENA's damage claims do not constitute 'covered damages' under the NAC CGL POLICIES, KADENA's claims are barred . . . Accordingly, evidence of damages not covered under the NAC CGL POLICIES is wholly irrelevant to the subject action [and] has no probative value." Global's motion demonstrates it knows full well how the settlement agreement operates, and we will not countenance its attempts to avoid that result on appeal.[5]

Finally, Global argues even if we find the offset ruling erroneous, we cannot reverse unless we find the error prejudicial. We have no trouble concluding Kadena was prejudiced by an unwarranted $321,975 reduction in its damage award. Accordingly, we reverse the offset ruling and direct the trial court to reinstate the full jury award.[6]

---

[5] Kadena brought Global's motion in limine to our attention in a motion to augment the appellate record, which we grant. Global argues we cannot augment the record with its motion in limine because Global never filed it with the court. The rule allowing record augmentation "is to be construed liberally" and allows a party to supplement the appellate record with any materials that were before the trial court. (*People v. Brooks* (1980) 26 Cal.3d 471, 484 citing an earlier version of Cal. Rules of Court, rule 8.155 [formerly rule 12]; *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn.3.) On the morning of the first day of trial, the court stated for the record that it had discussed Global's motion in limine with the parties, and Global agreed to withdraw it. We see no issue in considering something the trial court clearly considered.

[6] Reinstating the full award has no effect on Kadena's election not to pursue its mold and concrete damages under NAC's policy.

# III

## DISPOSITION

We reverse the order granting Global's motion for offset and affirm the judgment in all other respects.  Kadena shall recover its costs on appeal.

CERTIFIED FOR PUBLICATION

SLOUGH _____
J.

We concur:

MILLER _____
Acting P. J.

FIELDS _____
J.

38